In the Supreme Court of Georgia

Decided: October 20, 2014

S14A0804.  LAWSON v. THE STATE.
S14A0805.  JAMES v. THE STATE.

BENHAM, Justice.

Herman Lawson and Christopher James were jointly indicted, along with two others, for charges arising out of the shooting deaths of two victims.  In separate trials, appellants were convicted of all charges, including the malice murder of both victims.  At the first appearance of these cases before this Court, we reversed the trial court's grant of new trial to each appellant.  *State v. James*, 292 Ga. 440 (738 SE2d 601) (2013).  Upon remand, each appellant's sentence was reinstated, the remaining grounds for new trial raised in each appellant's motion for new trial were considered, and the trial court denied those motions.  Lawson's and James's appeals were consolidated for review by this Court.  For the reasons set forth below, we affirm the convictions as to each appellant.[1]

---

[1] The crimes were committed on August 20, 2005, and resulted in the deaths of Jeremiah Ingram and Fatima Fisher.  On November 21, 2006, appellants Herman Lawson and Christopher James were jointly indicted, along with two others, by the Fulton County Grand Jury on identical charges with respect to each victim:  malice murder, felony murder (predicated upon aggravated

Viewed in the light most favorable to the verdicts, the evidence in both trials showed the deaths arose out of a dispute over whether drugs had been stolen from co-indictee Bruce Roberts's apartment where the victims, Jeremiah Ingram and Fatima Fisher, were found by the co-indictees when they returned to Roberts's apartment after spending the evening at a night club. The co-indictees blamed the victims for stealing cocaine and then bound the victims and

assault with a deadly weapon), aggravated assault with a deadly weapon, kidnapping with bodily injury, and possession of a firearm during the commission of a felony. Appellant Lawson, alone, was also indicted for felony murder (predicated upon possession of a firearm by a convicted felon) with respect to each victim, and possession of a firearm by a convicted felon. Appellant Lawson was tried before a jury from April 29 to May 6, 2008 and was found guilty on all charges. With respect to the crimes against each victim, the felony murder conviction was vacated as a matter of law and the convictions for aggravated assault and kidnapping were merged with the conviction for the murder of that victim. The conviction for possession of a firearm by a convicted felon was also merged with the conviction for Ingram's murder. Lawson was sentenced to life imprisonment for both murders, to be served consecutively. The convictions on the two counts for possession of a firearm during the commission of a felony were merged and Lawson received a five-year suspended sentence.

Appellant James was tried before a jury from June 23 to June 27, 2008, and was found guilty on all charges. With respect to the crimes against each victim, the felony murder conviction was vacated as a matter of law and the convictions for aggravated assault and kidnapping were merged with the conviction for the murder of that victim. James was sentenced to life imprisonment for the murder of each victim, to be served consecutively. The convictions on the two counts for possession of a firearm during the commission of a felony were merged and James received a five-year suspended sentence.

Both appellants filed timely motions for new trial which were later amended. By order dated September 7, 2011, the trial court granted new trials to both appellants, and that order was reversed by this Court by judgment entered February 18, 2013. See *State v. James*, supra. Upon remand, each appellant's sentence was reinstated. After a hearing on Lawson's motion for new trial, and upon review of the record and transcript of the earlier hearing in James's case, the trial court considered the remaining grounds raised in each appellant's motion for new trial. Both Lawson's and James's motions for new trial were denied. James filed a timely notice of appeal on September 11, 2013, and Lawson filed a timely notice of appeal on September 27, 2013. Both appeals were docketed to the April 2014 term of this Court for decisions to be made on the briefs.

transported them in two different vehicles to a location in Fulton County where Lawson shot them at James's urging. The bodies were left near the side of the road. After the shooting, the co-indictees changed the tires on one of the vehicles and drove the other vehicle to a rural area in another county and set fire to it, as part of an attempted cover-up of the crimes.

The State's primary witness against all three of the co-indictees who faced trial[2] was Karryngton Sims, an unindicted witness to the crimes who was characterized by the State as a third victim. He testified about the events that transpired before and after the shootings, and testified that the shootings occurred at about sunrise. Sims testified that after these events he and the co-indictees returned to Roberts's apartment to hide out for a few days and agreed to tell police, if questioned, that they had last seen the victims leaving in the vehicle they had burned. Members of the group called Ingram's phone to leave messages in an effort to make it appear they did not know his fate. Another witness testified at the trials of both Lawson and James that she spoke to victim Fisher by phone several different times during the evening of August 19 into the morning of August 20. The witness testified that earlier in the evening, Fisher

---

[2] The other co-indictee who faced trial was Bruce Roberts.

was upset because Ingram was late picking her up. Eventually, Ingram let Fisher know he was coming to get her to take her out. This testimony is consistent with other testimony that Ingram had been seen at the night club earlier in the evening. The witness further testified that she last spoke to Fisher at approximately 4:00 a.m., at which time Fisher told her she and Ingram were about to leave Ingram's apartment at the Clairmont Lodge to go somewhere else.

Sims lived with Ingram at that apartment and testified that the two were partners in a drug dealing enterprise. Ingram's brother, Jayron Ingram, who also stayed at times at the Clairmont Lodge apartment, testified that Fisher had been at the apartment on the night of the shooting, that Ingram had stopped by to pick her up, and they left together. The brother also testified that later that night, a group comprised of Lawson, James, Roberts, and the other co-indictee, Michael Jenkins, came to the Clairmont Lodge apartment looking for drugs and searched the apartment. At James's trial, Jayron Ingram further testified that while the group was searching the apartment Roberts said he would kill Ingram.

The evidence further showed that a passerby discovered the bodies at around 8:30 a.m. along the roadway where Sims testified the victims were shot, and the passerby made a call to 9-1-1, thus resulting in an investigation of the

4

murders. The murders were linked to the burning of the vehicle, and a traffic ticket for Lawson and Lawson's probation papers were found at a later date on the ground at the scene where the burning vehicle had been discovered. The traffic ticket was dated just two days before the murders.

Both appellants attacked the credibility of witnesses Sims and Jayron Ingram and argued that except for this testimony there was no direct evidence linking them to the crimes. Each appellant asserted as a theory of the case that he did not accompany those who transported the victims to the place where they were shot and thus was not a party to the crimes. Lawson asserted that the evidence of his traffic ticket and probation papers were at most evidence that at some point he had been in the burned vehicle, which the evidence showed was shared and driven by several different people.

1. The evidence adduced at both trials and summarized above was sufficient to authorize a rational trier of fact to find both appellants guilty beyond a reasonable doubt of the crimes for which they were convicted. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. (a) At the trials of both appellants, the trial court admitted into evidence the medical examiner's autopsy report as to each victim, along with an

5

investigative summary compiled by the medical examiner's office which accompanied each autopsy report. The summary referenced information reported by the detective who investigated the crime scene, including certain information about the time and place where the victim's body was found. As set forth in this Court's previous opinion, the investigative summaries attached to the medical examiner's reports on these two victims consisted of pages labeled "Page 1 of 3" and "Page 3 of 3." *State v. James*, supra, 292 Ga. at 440-441.[3] Trial counsel for each appellant failed to object to the admission of the investigative summaries even though the clearly marked pagination of both reports indicated they were missing page two of three pages. As shown at the hearings on the motions for new trial, the missing page from each summary contained information regarding the condition of the bodies at the time the investigating officers examined them which was relevant to the time of death. Specifically, the summaries noted that the bodies were still warm to the touch

---

[3] In this Court's earlier opinion, we held the appellants failed to establish that the State violated *Brady v. Maryland*, 373 U.S. 83 (83 SCt 1194, 10 LE2d 215) (1963) by suppressing favorable evidence because appellants failed to show the missing page could not have been obtained with reasonable diligence. *State v. James*, supra, 292 Ga. at 441. Page two was also missing from the prosecutor's case file, leading the trial court to conclude in its order granting the appellants' motions for new trial that no malfeasance was involved and that the mistake was probably due to the fact that the reports, which were printed as three-paged double-sided documents, had been photocopied as one-sided documents. See id., at footnote 2.

6

and that rigor mortis had not set in. The fact that a page was missing came to light only after it was discovered and admitted at the later trial of co-indictee, Bruce Roberts, who was acquitted.

Both appellants assert that their respective trial counsel provided ineffective assistance as a result of counsel's failure to object to introduction of the incomplete investigative summaries along with counsel's failure independently to obtain the complete reports. According to each appellant, the missing information could have been used to impeach Sims's testimony about the time of day the murders took place, as well as to challenge the medical examiner's testimony regarding the estimated time of death, and thus each appellant claims he was prejudiced by his counsel's failure to obtain the reports. As evidence of alleged deficient performance of counsel, as well as the alleged prejudice created by that deficient performance, appellants point to the fact that Roberts's counsel noticed the missing pages and obtained them for use at Roberts's trial, and that he was acquitted. Both appellants assert their counsel's failure to notice the missing page and to obtain the complete report prior to trial demonstrates a failure of counsel to conduct even a rudimentary investigation into the accuracy of the medical examiner's report and thus establishes deficient

7

performance of counsel. Lawson asserts the medical examiner's testimony concerning estimated time of death was "wildly contradictory," and that he was prejudiced as a result of counsel's failure to obtain the summary reports because the reports could have been used to challenge the medical examiner's testimony. Both appellants point to what they deem to be significant differences between Sims's testimony about the time of the shootings and the medical examiner's testimony about the estimated time of death across the three trials of the co-indictees charged with these crimes.

The only information contained in the summary reports that was not otherwise established by other evidence, however, was (a) that neighborhood residents reported hearing gunshots around daybreak; and (b) that when the victims' bodies were examined by investigators at the scene at 9:45 a.m. they were warm to the touch and displayed no rigor mortis. Having reviewed the medical examiner's testimony in all three trials of the co-indictees[4], we find the testimony was not "wildly contradictory" at the Lawson trial as he asserts, nor was the testimony materially inconsistent between these two trials or between

---

[4] The pertinent volumes of the transcript of co-indictee Bruce Roberts's trial were attached as an exhibit to appellants' motions for new trial.

the testimony at these trials as compared to the testimony offered at the Roberts trial. Moreover, neither appellant has demonstrated how the information regarding the condition of the bodies at 9:45 a.m. was in any way materially inconsistent with the medical examiner's testimony that the window of time for the estimated time of death was between 4:30 a.m. and the time the autopsy was conducted at 12:30 p.m. Nor have they demonstrated how this information would have given them grounds to impeach Sims's testimony concerning the time of the shootings. In fact, that neighborhood residents reported hearing gunshots around daybreak was consistent with Sims's testimony. Further, the information in the summaries that the bodies were still warm when examined at 9:45 a.m., in conjunction with the medical examiner's testimony relating to how quickly body temperature cools after death, corroborates Sims's testimony that the shootings occurred later than 4:30 a.m., the earliest time within the medical examiner's window of time for the estimated time of death, and this information would not have assisted either counsel in their attempts to impeach Sims.

James was tried after Lawson, and at James's trial his counsel cross-examined Sims based upon his testimony in the Lawson trial. Counsel's failure to obtain a complete copy of the medical examiner's summary report did not

hamper James's opportunity to attempt to impeach Sims's testimony regarding the time of the shootings.

That Roberts, whose counsel obtained and used the complete summaries attached to the autopsy reports, was acquitted does not establish that the reason for acquittal was related to the introduction of the complete summary reports. Reliance upon Roberts's acquittal as evidence of insufficiency of trial counsel's representation fails to take into account that the undisputed testimony in all three trials that, among all the indictees, it was Lawson who shot the victims at James's urging. Such reliance fails to take into account that unlike appellants, Roberts presented alibi witnesses; that Roberts presented evidence from which the jury could conclude Roberts did not make calls to Ingram's phone the day following the murders, as Sims testified all the men agreed to do; and that Roberts impeached the testimony of a witness who testified that Roberts drove a gray Crown Victoria to the club where the others gathered on the night of the murders, by presenting evidence that he did not own such a vehicle at that time. Thus, that Roberts was acquitted fails to demonstrate these appellants were prejudiced by their counsel's failure to obtain the complete summaries because it fails to demonstrate that, but for counsel's omission, the result of either of

10

appellants' trials would have been different.

"To prevail on a claim of ineffective assistance of counsel, an appellant must prove both deficient performance of counsel and prejudice from the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)." *Bell v. State*, 294 Ga. 443, 445 (2) (754 SE2d 327) (2014). Pretermitting the issue of whether deficient performance is established by counsel's failure to notice the missing pages of the summary reports attached to these autopsies, object to the admission of incomplete documents, or obtain complete copies of the documents, both appellants have failed to make the showing necessary to establish constitutionally ineffective assistance of counsel. Because we find appellants failed to satisfy the prejudice prong of the *Strickland* test, this Court is not required to examine the other prong of the test. See *Johnson v. State*, 295 Ga. 421 (3) (761 SE2d 13) (2014).

(b) Both appellants also assert their trial counsel was deficient in failing to interview Altresa Hood and to call her as witness because, they argue, her testimony at the Roberts trial showed Sims's testimony was not credible. They further argue that Hood's testimony would have supported a jury finding that Sims was an accomplice to the murders and thus his uncorroborated testimony

11

could not alone convict them. Appellants claim that trial counsels' failure to call Hood as a witness was unreasonable because it resulted from negligence and not from a reasoned trial strategy. See *Martin v. Barrett*, 279 Ga. 593, 595 (619 SE2d 656) (2005). Thus, appellants assert that deficient performance of counsel is shown. Further, according to appellants, the testimony of Ms. Hood was one of the few significant differences between the evidence presented at these appellants' trials and the evidence presented at the Roberts trial, and this difference demonstrates another reason why Roberts was acquitted while these appellants were convicted. According to appellants, prejudice from the deficient performance of trial counsel is established.

Pretermitting the issue of whether prejudice has been shown, we disagree that the failure of trial counsel for either James or Lawson to interview or call Ms. Hood as a witness was unreasonable and unsupportable as trial strategy so as to constitute deficient performance. A strong presumption exists that counsel's conduct falls within the range of reasonable professional conduct, and a defendant has the burden of proof to affirmatively show that the purported deficiencies in counsel's performance were indicative of ineffective assistance and not examples of a reasonable trial strategy. See *Gill v. State*, ___ Ga. ___

12

(2) (\_\_\_ SE2d \_\_\_) (2014 WL 4667535) (Sept. 22, 2014). Ms. Hood's police interview was reviewed by appellants' respective trial counsel. While Lawson's counsel did not specifically remember her as a potential witness, his undisputed testimony at the motion for new trial hearing was that had he seen any useful testimony in her statement, he would have called her as a witness. James's trial counsel testified at the motion for new trial hearing that he attempted to contact Hood but was unable to do so. He also testified that based upon his review of Hood's statement to police, he did not want her "anywhere near the courthouse" during James's trial because he believed her testimony would implicate James. In fact, Hood's testimony at the Roberts trial corroborated Sims's testimony in that she testified Sims told her about the murders, and said "we," including Sims, Lawson, and James, were involved in tying up Ingram and transporting the victims to the place they were shot, and that Lawson shot them, thereby implicating both Lawson and James. That her testimony also implicated Sims, in that he included himself in the group that tied up and transported the victims, is merely cumulative of Sims's own testimony. At their trials, even without Hood's testimony, both appellants used the evidence presented to attempt to impeach Sims's credibility and portray him as a participant in the crimes whose

13

testimony should not be believed. From the evidence as a whole, however, the jury was entitled to reject these arguments. See *Gill v. State*, supra, ___ Ga. at (1). The failure to call Hood as a witness was a reasonable trial strategy for trial counsel and, accordingly, appellants have failed to establish ineffective assistance of trial counsel. See *Miller v. State*, ___ Ga. ___ (2) (a) (I) (___ SE2d ___) (2014 WL 4958168) (Oct. 6, 2014).

3. Both appellants claim that a review of all three trials shows such inconsistency between Sims's testimony that the truthfulness of his statements must be called into question. Accordingly, each appellant argues his conviction based upon Sims's testimony must be deemed a due process violation. Relying upon an opinion of the United States Court of Appeals for the Eighth Circuit, appellants argue that a due process violation occurs when "the State's zeal to obtain multiple murder convictions on diametrically opposed testimony renders [a conviction] infirm." *Smith v. Groose*, 205 F3d 1045 (8th Cir. 2000). But in the *Smith* case, "what the State claimed to be true in [one] case it rejected in [the co-defendant's] case, and vice versa." Id. at 1050. The *Smith* case involved two defendants who were separately indicted and tried at different times for, among other offenses, burglary and murder. In the first case tried, the State presented

an out-of-court statement to impeach a witness, in which the witness told police that the murders occurred after he entered the victims' home, and, based on this evidence, the jury convicted the defendant in that trial, one of the witness' accomplices, of felony murder. In the trial of the second defendant, the same witness testified that the victims were already dead when he and his accomplices entered the victims' home, and, based on that testimony, the jury convicted the defendant in that trial, who had preceded the witness and his accomplices into the home, of first-degree murder. In the trials at issue in this case, however, the State did not argue at one trial that Lawson was the trigger man and in the other trials that James or Roberts did the shooting. Rather, in each trial, Sims testified that Lawson was the shooter and that James encouraged him to commit the shootings.

Having reviewed the three transcripts, we conclude the differences between Sims's testimony at these trials is not materially significant with respect to the sufficiency of the evidence to convict these appellants. The discrepancies between his testimony at these trials consists largely of such details as who went to the club the evening of the shootings; whether, upon returning from the club and learning that Roberts claimed drugs were missing from his apartment,

15

Lawson pulled out his gun and forced everyone inside the apartment, or pulled out the gun once everyone was already inside; whether the group went to change the tires on Roberts's car before or after driving the vehicle to the countryside to set it afire; and Sims's inability to pinpoint the exact time of certain occurrences surrounding the killings. These variations in testimony are the sort that may be reasonably explained by the passage of time. This is not a case where the government used "inherently factually contradictory theories and changed the color of its stripes from one trial to the next by advancing an inconsistency . . . at the core of the prosecutor's separate cases against defendants for the same crime. Far from it." (Citations and punctuation omitted.) *United States v. Hill*, 643 F3d 807, 834 (11th Cir. 2011). Accordingly, each appellant's assertion that his constitutional right to due process was violated lacks merit.

Judgments affirmed. All the Justices concur.