305 Ga. 268
FINAL COPY

S18A1445.  BATTLE v. THE STATE.

NAHMIAS, Presiding Justice.

Appellant Shuntae Battle was convicted of malice murder, aggravated assault, and first-degree cruelty to children in connection with the death of her three-year-old daughter, Jazmine Jerkins.  Appellant contends that the evidence presented at her trial was insufficient to support the malice murder and cruelty to children convictions; that her right to due process was violated because the prosecutor's arguments about her credibility and culpability at her trial differed from the prosecutor's  arguments at her co-indictee Juan Johnson's prior trial; and that the prosecutor's incorrect statements of the law during closing argument require reversal.  Finding no merit to these contentions, we affirm her convictions for malice murder and cruelty to children, but we vacate her conviction for aggravated assault, because that count should have merged into

the malice murder conviction.[1]

1.  (a)  Viewed in the light most favorable to the verdicts, the evidence presented at Appellant's trial showed the following.  In March 2010, Appellant was living in her grandmother's house with her two children, Jazmine and a one-year-old boy, when she began dating Juan Johnson.  Johnson took an active role in helping Appellant care for her children, becoming particularly involved in Jazmine's discipline.  He told Appellant that Jazmine was too free-spirited and that Appellant was too "soft" on her.  Before beginning a relationship with Johnson, Appellant would discipline Jazmine by taking away her toys, making her stand in the corner holding her hands up, and occasionally

---

[1] The murder occurred on August 11, 2010.  On November 9, 2010, a Fulton County grand jury indicted Appellant and Johnson for malice murder, felony murder based on aggravated assault, felony murder based on first-degree cruelty to children, aggravated assault, and first-degree cruelty to children. Johnson was tried from July 11 to 14, 2011; Appellant testified for the State at his trial. The jury found him not guilty of malice murder, hung on the two felony murder counts, and found him guilty of aggravated assault and cruelty to children.  (The record does not show if Johnson was ever retried.) Appellant was then tried from August 22 to 25, 2011; Johnson did not testify at her trial. The jury found Appellant guilty on all counts. The trial court sentenced her to life imprisonment for malice murder, ten concurrent years for aggravated assault, and ten concurrent years for cruelty to children. The court merged the felony murder counts (although they were actually vacated as a matter of law, see Malcolm v. State, 263 Ga. 369, 374 (434 SE2d 479) (1993)). As discussed in Division 1 (c) below, the aggravated assault verdict should have merged into the malice murder conviction. Appellant filed a motion for new trial on August 30, 2011, and she amended it with new counsel on December 6, 2016. After an evidentiary hearing, the trial court denied the motion on August 31, 2017. Appellant filed a timely notice of appeal, and her case was docketed in this Court for the August 2018 term and submitted for decision on the briefs.

2

spanking her on her bottom with a hand or a small belt. Johnson's discipline method involved more spanking, using his hand to spank Jazmine on her bottom or her hands.

At the end of May, Appellant and her children moved out of her grandmother's house due to conflicts between other family members living in the house. They lived with Appellant's aunt for about two weeks before they moved in with Johnson. He lived in a small cottage at the back of his parents' house; it did not have a functioning bathroom, so they would use the bathroom in his parents' house or a portable toilet in the cottage. Around this time, Appellant was having health problems and had to stay in the hospital for three days and get a blood transfusion. When she was released from the hospital, she was still very weak, and Johnson offered to take over primary responsibility of caring for Jazmine. Johnson began to increase the severity of Jazmine's discipline, whipping her on the bottom with a large, thick, leather belt an increasing number of times per day. Appellant authorized this discipline, and whenever Jazmine was being disciplined, Appellant was present. Appellant also whipped Jazmine with the belt, sometimes taking turns with Johnson.

On August 11, 2010, Appellant, Johnson, and the two children spent most

of the day at home. Throughout the day, Johnson frequently commanded Jazmine to hold her hands above her head, because she had trouble sleeping at night and he wanted to tire her out. She dropped her hands several times, and each time, Johnson spanked her with the belt on her bottom. Appellant also hit Jazmine on the bottom twice that day because Jazmine urinated on herself. That evening, Jazmine defecated on the floor and herself, and Appellant punished her by spanking her bottom two more times with the leather belt. Johnson said Jazmine needed to be punished more, however, and he then began to whip the child more severely. He spanked her with the belt "continually at least 20 times." Jazmine began yelling and twisting, trying to avoid the blows while Johnson held her in place, so the blows hit Jazmine on her torso and not just her bottom. When Jazmine fell to the floor, Johnson yanked her back up by her hair and started whipping her again. At some point during this beating, Appellant left the room. After she returned, she told Johnson to stop, and they argued. Jazmine said she had to go to the bathroom; Appellant put her on the portable toilet, but she fell off. Appellant fed Jazmine some applesauce and then gave her a bath. During the bath, Appellant became concerned first when she noticed that Johnson had pulled out a section of Jazmine's hair and then when Jazmine

4

began acting sleepy and slurring her words.

Appellant told Johnson to drive them to the hospital; on the way, Jazmine's breathing became faint, and they called an ambulance. A police officer and paramedics met them in a parking lot. Appellant told the officer that she did not know how Jazmine had been hurt, and she told one of the paramedics that Jazmine had fallen off the toilet and hit her head. Jazmine did not have a pulse and was rushed to Hughes Spalding Hospital. Although the paramedics were able to restart her heartbeat on the way to the hospital, based on the time she had been without a heartbeat, there was almost no chance that she could regain normal brain function. Jazmine was transferred to Scottish Rite Hospital, but pronounced dead shortly thereafter. At the first hospital, Appellant told the pediatric emergency room doctor that she and Johnson had been disciplining Jazmine and that Jazmine fell off a toilet seat, and she told a social worker that she had left the room and covered her ears for part of the time while Johnson was beating Jazmine.

Medical examinations and an autopsy showed that Jazmine had widespread bruising, including external bruises on her neck, shoulders, chest, abdomen, back, buttocks, arms, legs, and feet. All of these bruises were

5

relatively fresh and had been inflicted around the same time. The bruises on her back and buttocks were consistent with being hit multiple times with a belt or being punched or kicked, and the injuries on her neck were consistent with someone holding her by the neck. She also had small lacerations on her neck and face. A portion of her hair had been ripped out of her scalp. Jazmine also had internal bruising on both lungs, which caused massive internal blood loss into her chest, and on the front, back, and right side of her scalp, which the medical examiner testified was not consistent with a head injury caused by a fall from a toilet. The medical examiner concluded that Jazmine's cause of death was blunt force trauma of the torso and head, with the contributing condition of soft tissue hemorrhage.

Appellant testified at trial, presenting much of the information discussed above regarding the night of Jazmine's death and admitting that she may have caused some of the child's bruises. However, Appellant said that contrary to what she had told the social worker, she never left the room and covered her ears. Instead, she claimed that Johnson had stopped hitting Jazmine by the time she left the room; she did not hear anything while she was out of the room; and when she returned she saw Johnson holding Jazmine by the hair and beating

Jazmine and immediately told him to stop. Appellant's defense was that Johnson inflicted the fatal wounds and that she did not act with malice when she punished Jazmine.

(b) Appellant argues that the evidence presented at trial was legally insufficient to prove that she committed malice murder and first-degree cruelty to children because the evidence proved only that she was negligent. At trial, Appellant admitted that she sometimes hit Jazmine with a leather belt (including on the day of Jazmine's death); that she allowed and encouraged Johnson to discipline Jazmine, including whipping Jazmine with the belt; and that she was present on the night of Jazmine's death while Johnson hit Jazmine with a belt continually and repeatedly on her body as the child yelled and twisted trying to avoid the blows and also yanked Jazmine's head around by her hair. The jury also heard evidence about the severity of Jazmine's injuries and the cause of her death, and the jury was entitled to reject Appellant's self-serving testimony discounting her role in the fatal events. See Cushenberry v. State, 300 Ga. 190, 192 (794 SE2d 165) (2016). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence" (citation and

punctuation omitted).) .

When viewed in the light most favorable to the verdicts, the evidence was sufficient for a rational jury to find beyond a reasonable doubt that Appellant was guilty at least as a party to the crimes of malice murder and first-degree cruelty to children. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also OCGA §§ 16-5-70 (b) (defining first-degree cruelty to children as "maliciously caus[ing] a child . . . cruel or excessive physical or mental pain"), 16-2-20 (defining parties to a crime); Butler v. State, 292 Ga. 400, 402 (738 SE2d 74) (2013) ("[T]he evidence concerning the severity and scope of the injuries that [the child] sustained would permit an inference that whoever struck [her] did so maliciously and that the injuries were not the result of reasonable disciplinary measures.").

(c) Although Appellant has not raised this issue, our review of the record shows that the guilty verdict for aggravated assault should have merged into her malice murder conviction, because the aggravated assault immediately caused the fatal injuries and there was no "evidence that a 'deliberate interval' separated the infliction of an initial non-fatal injury from the infliction of a subsequent fatal injury." Reddings v. State, 292 Ga. 364, 366-367 (738 SE2d

8

49) (2013).  Although there was evidence that Appellant and Johnson hit Jazmine on her bottom as punishment throughout the day on which she died, the evidence did not show that any of those punishments "caus[ed] injury to [Jazmine's] head and torso," as alleged in the aggravated assault count of the indictment; the malice murder count similarly alleged that Appellant caused Jazmine's death by "inflicting blunt force trauma against [her] head and torso." The prosecutor did not argue that the earlier blows were the basis for the aggravated assault charge, and there was no other evidence of a deliberate interval between the aggravated assault and the murder.  Accordingly, we vacate Appellant's conviction and sentence for aggravated assault.

2.     Appellant contends that the State impermissibly changed theories when it argued at Johnson's trial that she was trustworthy but argued at her own trial that she was not.  We see no ground for reversal.

(a)     As mentioned above in footnote 1, Johnson was tried before Appellant.  She was compelled to testify at his trial by an order of testimonial immunity, but was not given a deal for her testimony.  Appellant also testified at her own trial, in a way that was generally consistent with her testimony at Johnson's trial.  The same prosecutor tried both cases.  And in both cases,

9

Appellant's testimony was an important part of the State's proof, as she could testify directly about the beating Jazmine received on the day of her death.

In closing argument at Johnson's trial, the prosecutor highlighted why the jury should find Appellant's account of Johnson's actions credible:

> [W]hen deciding somebody's credibility, you want to look at the manner of testifying, intelligence, interest or lack of interest in the case, and the means and opportunity of knowing the facts. I want to use [Appellant] as an example. Look at the interest or lack of interest in the case. We gave her no deal, no deal. No charges were dropped. Nothing. What is her interest in this? What is her interest in testifying? How does that help her? Doesn't.
> . . .
> [She a]dmitted to beating her child with a belt and explained why. Now, if you did it, why would – you wouldn't admit to everything. If you were the main one doing it, why would you admit to beating the child as well? You'd put it all on him. . . . That's not what she did. She admitted to her part. . . . So she's not trying to plant it on him. She was telling the truth.

The closing argument minimized Appellant's role to some extent, but the prosecutor pointed out that Appellant was still criminally culpable:

> [Appellant] made several horrible decisions with her child. One of them is moving in there in the first place. The other one is allowing this to happen. Although she assisted in the beating of her child, which is why she's being charged as well and will have her day in court, and allowed the defendant to murder her child, her account of what happened is consistent with the evidence.

And although the prosecutor focused his argument on the theory that Johnson

10

was the defendant who inflicted the fatal injuries, he also mentioned the possibility of party to a crime liability:

> Even if you believe, despite the evidence and despite what you heard from his own mouth, despite what you heard from [Appellant], even if you believe, you know what, I think [Appellant] was the one who did most of this and I think he participated but I don't think he's the one, even if you believe that despite the evidence, it's still aided and abetted. He's still helping out. That's party to a crime for everything.

At Appellant's trial the next month, the prosecutor adjusted his characterization of her testimony, now asserting in his closing argument that Appellant was trying to minimize her involvement:

> People who have a motive, motive to not tell the truth or to minimize their involvement. From her testimony, do you really believe that that's all she did? . . . You really believe that it was Juan Johnson that did everything? She is minimizing her involvement. She is on trial, okay. Not admitting everything.

The prosecutor also again argued party to a crime, although this time focusing on Appellant's culpability:

> Let's say you do believe [Appellant's] story. I mean, despite the fact that she said I didn't hear anything, even though her child was being beaten to death, despite the fact that she said it was the hair missing from her head and not all the bruises on her body that alarmed me, if you want to believe her and believe that Juan Johnson did everything, party to a crime. You encouraged it. You introduced it. You sat there and watched and didn't call 911 or

11

anything.  You aided and abetted.  So how – she is still guilty, even if you believe that story that Juan Johnson did all these injuries. Still party to a crime.  Doesn't change anything.  Of course, that's not what really happened, but if you believe that, still guilty.

(b)    This Court has explained that "[t]here is no general legal prohibition against the State using contradictory theories against different defendants before different juries in separate criminal trials." Johnson v. State, 258 Ga. 506, 508 (371 SE2d 396) (1988).  More recently, however, we assumed that there could be a due process problem if the State uses "'inherently factually contradictory theories.'"  Lawson v. State, 296 Ga. 1, 9 (764 SE2d 816) (2014) (quoting United States v. Hill, 643 F3d 807, 834 (11th Cir. 2011)). The Eleventh Circuit's  opinion in Hill actually casts doubt on whether such a due process right exists.  See 643 F3d at 832 ("[I]t is not at all plain that a defendant has a right to prevent the prosecution from using inconsistent theories to prosecute two separately tried defendants charged with the same crime.").  See also Bradshaw v. Stumpf, 545 U.S. 175, 190 (125 SCt 2398, 162 LE2d 143) (2005) (Thomas, J., concurring) ("This Court has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories.").  But even assuming, as we did in Lawson, that such a

12

right exists, we see no violation here.

Although the prosecutor modified his arguments between Johnson's trial and Appellant's, at both trials the prosecutor argued that Appellant was criminally culpable and that she and Johnson were parties to the crimes against Jazmine. The adjustment in the prosecutor's argument about Appellant's credibility reflected not "inherently factually contradictory theories," but rather a permissible change to focus on the defendant being tried. It was reasonable, for example, for the prosecutor to shift from arguing that Appellant had no motive to lie at Johnson's trial to arguing that she had a motive to minimize her involvement at her own trial. Likewise limiting discussion of Appellant's culpability to a passing remark that she had also been charged and would get her day in court made sense at Johnson's trial, but would be an odd closing argument for Appellant's own trial. The prosecutor's differing approaches to Johnson's and Appellant's trials do not warrant reversal of her convictions.

3.    Two forms of involuntary manslaughter were listed on the verdict form as lesser included charges for murder — one based on battery and the other based on reckless conduct. During his closing argument, however, the prosecutor told the jurors that to find Appellant guilty of involuntary

13

manslaughter, they would have to believe that Jazmine's death was an accident, and he apparently showed a PowerPoint slide that said "accident is a requirement for involuntary manslaughter" and "this is not misdemeanor battery."[2]  Appellant objected and moved for a mistrial.  In response, the prosecutor argued that if the court thought he had misstated the law, a curative instruction would be sufficient.  The trial court ultimately gave the following curative instruction:

> [I]t is apparent that the State doesn't believe this is involuntary manslaughter, but they have misstated the law to you, and when they put that slide on the board about accident, shouldn't have been anything about misdemeanor in there.  So I'm asking you to disregard that.  They have misstated the law.  I have admonished them.  I'm admonishing him now.  So is anybody not going to be able to follow my instruction?  You are to disregard what he just told you the law was.  You are going to receive the law from me. They are allowed to argue the law, as long as they are correct about it.  But when they get [it] incorrect, then I have to intervene, and, ultimately, you know, I'm going to read this long charge.

The court then asked any juror who could not follow that instruction to raise a hand; no one did.  During the jury charge, the trial court appropriately defined involuntary manslaughter as causing a death "without any intention to do so by

---

[2] The PowerPoint slide is not in the record.  This is how Appellant's counsel described the slide when she objected to it at trial (and no one disagreed with that description).

14

the commission of the offense of battery" or "by the commission of the offense of reckless conduct."

Also during closing argument, the prosecutor said the following when summarizing the evidence against Appellant:

> You know, you hear the testimony. . . . You heard her words about being there all the time when Juan Johnson would whip her child. You heard the testimony of her giving the bruises and whipping her for two months. Can you say beyond a reasonable doubt that she didn't do it?

Appellant objected, and the trial court said: "[T]hat is an incorrect statement. There is no burden on the defendant whatsoever. So, I mean, again, ladies and gentlemen, he has misstated the law." The prosecutor asserted that he had actually said "can you say beyond a reasonable doubt that she did it," and the court responded, "Well, that's fine." The prosecutor then continued his argument. The court correctly explained the burden of proof during the jury charge.

The prosecutor's misstatements of the law were clearly improper, but the court admonished him in front of the jury and correctly instructed the jurors on the points of law the prosecutor had misstated. "Whether to declare a mistrial is a question committed to the discretion of the trial judge, and the denial of a

15

mistrial is reversible error only if it appears that 'a mistrial was essential to preserve the defendant's right to a fair trial.'" McKibbins v. State, 293 Ga. 843, 848 (750 SE2d 314) (2013) (citation and punctuation omitted). Given the court's broad discretion and appropriate corrective action, "we cannot conclude that the trial court abused its discretion when it denied a mistrial." Id. at 850.

Judgment affirmed in part and vacated in part. All the Justices concur.

Decided February 18, 2019.

Murder. Fulton Superior Court. Before Judge Cox.

Stephen R. Scarborough, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Teri B. Walker, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.