NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 18, 2023

S22A1081.  RIDLEY v. THE STATE.

PINSON, Justice.

Kentrick Ridley was convicted of malice murder and related crimes in connection with the shooting death of Rico Bynum.[1] On appeal, Ridley contends that the evidence was not sufficient as a matter of due process to support his convictions, that the trial court

---

[1] The crimes occurred on April 25, 2016. In August 2017, Ridley was indicted by a Fulton County grand jury for malice murder, felony murder, aggravated assault, and possession of a firearm during the commission of a felony. At the conclusion of a jury trial held November 28 through December 3, 2018, Ridley was found guilty on all four counts. Ridley was sentenced to life in prison without the possibility of parole for the malice-murder count and a consecutive term of five years probated for the firearm-possession count. The remaining counts were vacated by operation of law or merged for sentencing purposes. Prior to his sentencing, Ridley filed a premature motion for new trial, which ripened upon the entry of the final disposition on January 2, 2019. See *Southall v. State*, 300 Ga. 462, 464-467 (1) (796 SE2d 261) (2017). Through new counsel, Ridley amended his motion for new trial in February 2022. After a hearing in April 2022, the trial court denied the motion on May 13, 2022. Ridley filed a timely notice of appeal on May 23, 2022, and an amended notice of appeal on May 24, 2022. The appeal was docketed to the August 2022 term of this Court and was thereafter submitted for a decision on the briefs.

failed to fulfill its role as the "thirteenth juror," and that the trial court erred by allowing the prosecutor to make certain statements during her closing argument. But the record shows that the evidence was sufficient to support Ridley's convictions and that the trial court exercised its role as the thirteenth juror. And most of the closing-argument statements that Ridley challenges were proper comments on the defense's failure to present evidence—made with express reference to the fact that the burden of proof rests "completely" with the State—while the remaining statement at issue properly asked the jury to draw a reasonable inference supported by undisputed evidence. So we affirm Ridley's convictions and sentences.

1. Viewed in the light most favorable to the verdicts, the evidence at trial showed as follows. In the early morning hours of April 25, 2016, Bynum was shot and killed on Grand Avenue in Fulton County. The shooting was witnessed by Theresa Scruggs and Robert Green, both of whom testified at trial.

(a) Scruggs testified that, as of April 2016, she was homeless, addicted to crack cocaine, and working as a prostitute. She became

2

friends with Bynum, a pimp, after she began buying drugs from him. Although Bynum wanted to have a romantic relationship with her, Scruggs initially refused because Bynum was married and living with his wife.

Scruggs then met Ridley. They began a sexual relationship, and she moved in to Ridley's apartment. But within two or three days, Bynum, who had kicked his wife out of his home, convinced Scruggs to come live with him. Scruggs testified that Ridley "wasn't happy" about her leaving.

According to Scruggs, the shooting occurred five or six days after she left Ridley for Bynum. During those five or six days, Ridley texted her constantly, asking her to come back, and he also called her, saying on one occasion that she "ha[d] until Monday to come back." About two or three days before the shooting, after seeing Ridley's text messages to Scruggs, Bynum called Ridley and warned him not to come back to that side of the neighborhood, "[i]f he knew what was good for him."

On the night of April 24, Scruggs and Bynum walked from their

home to the Express Zone gas station at the end of Grand Avenue. While Bynum stayed at the gas station to sell crack, Scruggs and another woman walked down the street, where they came across a man whom Scruggs ultimately joined in his car. The man, Albert Remler, told her he was a contractor, and, because Scruggs was interested in construction work, she gave him her name and phone number. She ultimately performed a sexual act in exchange for $10 in cash plus a $20 check.

Scruggs returned to the gas station and gave Remler's $20 check to Bynum. They went to a nearby check-cashing business but were unable to cash the check. They then walked back towards the gas station and encountered Robert Green, who joined them. After walking together for some distance, Green asked to talk to Scruggs, and the two turned around and walked away from Bynum down Grand Avenue.

As Scruggs was walking with Green, Ridley appeared "from out of nowhere" with a gun. Scruggs asked what was going on, and Ridley responded, waving the gun and "hollering" that "nobody

4

threatens me. . . . [Y]ou choose him over me, and he calls me threatening me." Trying to defuse the situation, Scruggs told Ridley she would leave with him. By this time, Bynum had started walking toward them. Ridley greeted Bynum with, "What's up man," and then began firing the gun. Bynum fell to the ground with a fatal gunshot wound to the neck.

Ridley and Green ran from the scene. Scruggs first tried to talk to Bynum, and then she fled when she realized he wasn't breathing. Within a few minutes, she was intercepted by Ridley and Green, who were in Ridley's truck. Ridley pointed his gun at Scruggs and said, "[Y]ou can either die here with him or you can get in." Scruggs got in the truck. Ridley drove to a motel, where Green sold Ridley's gun. The trio then collected their belongings and left town for Memphis.

Scruggs and Ridley stayed in Memphis until December 2016, when Ridley was apprehended by law enforcement officials. Scruggs testified that while they were in Memphis, Ridley would not let her leave his presence. She tried to escape twice, but failed each time. She did not contact the police during this time because she was

afraid.[2]

Surveillance videos from the check-cashing business, the gas station, and Atlanta Police Department street cameras corroborated various details of Scruggs's account of the events leading up to the shooting. In particular, the videos captured Ridley and Green walking in the area at 1:04 a.m. on April 25, less than 30 minutes before police were notified of Bynum's shooting.

(b) Green testified that he had become friends with Ridley after repairing Ridley's truck. On the night of the shooting, Ridley asked Green to look at a problem with his truck, and after doing so, Green rode with Ridley to see whether the problem was fixed. They ended up at the Express Zone.

According to Green, at some point after they arrived at the gas station, Scruggs walked up to them, followed by a man. Ridley and the man argued, and Ridley then shot the man. Green walked away and was soon picked up by Ridley. They drove off, Green sold

---

[2] Scruggs did manage to leave Memphis in May 2016 for a brief time but then allowed Ridley to retrieve her, and the pair stopped in Atlanta for a brief time on their way back to Memphis.

Ridley's gun, and he, Ridley, and Scruggs left town for Memphis. Green testified that he had previously cleaned Ridley's gun, a .45-caliber automatic handgun.

Investigators never found the gun used in the shooting, but they recovered six cartridge cases and one bullet from the crime scene, all of which were .45-caliber. A GBI firearms examiner testified that the six cartridge cases had all been fired from the same .45-caliber gun. The firearms examiner also testified that the three bullets recovered from Bynum's body were .45-caliber too, and that they had been fired from the same gun as the bullet found at the scene.

(c) The lead investigator in the case, Detective Michael Young, testified about the investigation and how his team had identified and located Scruggs and Ridley. The $20 check Scruggs and Bynum had tried to cash was recovered from Bynum's pants pocket; this check led Detective Young to Remler, who still had the check stub on which Scruggs had written her name and phone number. Detective Young contacted Scruggs and arranged to meet with her

7

under the guise of needing help with a construction job. After revealing that he was a detective, Young interviewed Scruggs, and she identified Ridley as the shooter. Detective Young confirmed that surveillance videos and other evidence corroborated key aspects of Scruggs's account.

2. Ridley contends that the evidence was not sufficient to sustain his convictions as a matter of constitutional due process. Ridley asserts that the witnesses the State presented were not credible, notes that no physical evidence directly linked Ridley to the shooting, and contends that the State failed to connect him to the murder weapon. Ridley also points out that he never admitted to shooting Bynum, and that no video or audio recording showed that he was the shooter.

When assessing a challenge to the sufficiency of the evidence as a matter of constitutional due process, the evidence presented at trial is viewed in the light most favorable to the verdicts to determine whether any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of all the crimes of

8

which he was convicted. See *Jones v. State*, 304 Ga. 594, 598 (2) (820 SE2d 696) (2018) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979)). In making this determination, we do not evaluate witness credibility, resolve inconsistencies in the evidence, or assess the weight of the evidence; these tasks are left to the sole discretion of the jury. See *Walker v. State*, 296 Ga. 161, 163 (1) (766 SE2d 28) (2014). The jury's verdicts will be upheld as long as some competent evidence, even if contradicted, supports each fact necessary to make out the State's case. See *Jones*, 304 Ga. at 598 (2).

Applying this standard here, the evidence was sufficient to support Ridley's convictions for malice murder and possession of a firearm in connection with that crime.[3] Both Scruggs and Green testified that they saw Ridley shoot Bynum. Surveillance footage showed Ridley in the area of the shooting shortly before it occurred. There was evidence that Ridley possessed a gun of the same caliber

---

[3] As noted above, the felony-murder count was vacated by operation of law, and the aggravated-assault count merged with the malice-murder count.

as the cartridge cases and bullets recovered from the scene and from Bynum's body. Ridley had recently been threatened by Bynum and had a clear motive for committing the shooting. And immediately after the shooting, Ridley fled Atlanta for Memphis. This evidence was sufficient for a rational trier of fact to find Ridley guilty beyond a reasonable doubt of these crimes. See, e.g., *Coates v. State*, 310 Ga. 94, 98 (849 SE2d 435) (2020) (evidence was sufficient to sustain convictions where eyewitnesses identified defendant as the shooter and defendant fled country immediately after the crimes); *Jackson v. State*, 288 Ga. 213, 214 (1) (702 SE2d 201) (2010) (evidence was sufficient to sustain convictions where eyewitnesses identified defendant as the shooter and there was evidence that defendant had a motive to commit the shooting).

3. Ridley next contends that the trial court abused its discretion by failing to exercise its role as the "thirteenth juror" in considering his motion for new trial.

"Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the

10

jury 'is contrary to . . . the principles of justice and equity,' OCGA § 5-5-20, or if the verdict is 'decidedly and strongly against the weight of the evidence.' OCGA § 5-5-21." *Drennon v. State*, 314 Ga. 854, 860 (2) (__ SE2d __) (2022) (citation and punctuation omitted). When these so-called "general grounds" are properly raised in a timely motion for new trial, the trial judge must "exercise a broad discretion to sit as a 'thirteenth juror.'" Id. (citation and punctuation omitted). This role requires the judge to consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. See id.

The trial court performed its thirteenth-juror role here. This is plain from the face of the order denying Ridley's motion for new trial. In that order, the court expressly states that it "re-examine[d] . . . the weight of the evidence and the credibility of witnesses, as an independent fact-finder" and that, having done so, it "decline[d] to grant a new trial on these general grounds." So the record refutes Ridley's contention that the court failed to fulfill its role as the thirteenth juror. See *Strother v. State*, 305 Ga. 838, 843 (3) (828

11

SE2d 327) (2019). And the merits of the trial court's decision on the general grounds are not subject to our review: "this Court does not sit as an arbiter of the general grounds, which are solely within the discretion of the trial court." Id. (citation and punctuation omitted). This claim therefore fails.

4. Ridley also contends that the trial court abused its discretion in overruling his objections to certain statements the prosecutor made during closing arguments. He claims that several of the prosecutor's statements improperly shifted the burden of proof to the defense, and that one statement argued facts not in evidence. Ridley is correct that these arguments are reviewed for abuse of discretion. See *Moore v. State*, 307 Ga. 290, 297 (5) (835 SE2d 610) (2019). We take each of these two arguments in turn.

(a) On several occasions during closing argument, the prosecutor noted for the jury that the defense had the same power to subpoena witnesses as the State. This point was responsive to the defense's efforts throughout the trial to cast doubt on the State's case by highlighting its failure to present testimony from various

people who, the defense claimed, would have had information relevant to the investigation. On the first occasion, the prosecutor stated:

> The one thing I want to tell you that's real important is that the burden is on the State to prove [guilt] beyond a reasonable doubt. The defense has absolutely no burden whatsoever to do anything. They don't have to do anything. The burden is completely on us, but the State has subpoena power to make people come to court. Given a subpoena they have to come to court. Bring your evidence with you. They have the exact same subpoena power.

Ridley's trial counsel objected on the ground of "shifting the burden." The objection was overruled, and the prosecutor continued to press the point. Later in her closing, the prosecutor returned to this topic:

> [The] State's not hiding anything from you. I told you in opening. Not putting up a bunch of witnesses who were not present and didn't see the murder. The defense counsel asked . . . a bunch of questions of what would they . . . have said. If these witnesses were going to exonerate [Ridley] they could have subpoenaed [them.]

Again, trial counsel objected based on burden-shifting, and the objection was overruled.

At another point, the prosecutor stated:

> Do you know what the defense is other than hey, the State didn't put up four witnesses that never saw the homicide. Yeah, that's right. The State didn't bring four people that never saw the homicide. So that's the defense, attacking the State. Well, somebody murdered this man. Somebody murdered Rico Bynum, right. He was gunned down.

Trial counsel objected, arguing that "the State is implying that we have to give the person who committed the murder." The objection was overruled, and the prosecutor went on:

> The burden is on the State to prove this to you beyond a reasonable doubt. The defense doesn't have to prove someone else did it. But ladies and gentlemen, I'm allowed to ask you who else did it? What other evidence is there that anyone other than Kentrick Ridley did this? The State has proven it to you beyond a reasonable doubt.

Ridley now contends that the trial court abused its discretion in overruling these objections, asserting that the prosecutor's statements had the effect of communicating to the jury that the defense did bear some burden of proof.

A prosecutor has "wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion." *Moore*, 307 Ga. at 297 (5) (citation and punctuation omitted). And where the defense presents no evidence to rebut the evidence of

14

guilt, it is not improper for the prosecutor to point out that fact to the jury. See *Kilgore v. State*, 300 Ga. 429, 432 (2) (796 SE2d 290) (2017) (an argument that the defense has failed to rebut or explain the State's evidence does not amount to improper burden-shifting); *McCord v. State*, 268 Ga. 842, 843 (3) (493 SE2d 129) (1997) (same). The prosecutor's statements here were proper comments on the defense's failure to present evidence, made with express reference to the fact that the burden of proof rests "completely" with the State. So these statements were well within the bounds of proper closing argument, and the trial court did not abuse its discretion in overruling Ridley's objections to them.

(b)   At one point during her closing argument, apparently trying to rebut the defense's argument that Scruggs's account of walking off with Green down Grand Avenue just before the shooting was not believable, the prosecutor stated:

> I'm sorry to have to do this, but if you're a prostitute and a strange man say[s] hey, let's go to the really real dark area by the wood in exchange for money for sex does your —

15

Trial counsel objected on the ground that the remark stated facts not in evidence. The court responded by directing the jury to "remember the evidence to the best of your collective ability." The prosecutor went on:

> I'm not talking about evidence, ladies and gentlemen. The defense got up here and said it was unreasonable for Rico Bynum to let Theresa Scruggs walk off with [Green]. My argument is perfectly reasonable because if you're the pimp you're watching the guy and the girl walk off together to the dark area what do you think is going to happen over there if you're the pimp.

Ridley contends that the trial court abused its discretion by allowing the prosecutor to argue facts not in evidence. See OCGA § 17-8-75 ("Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same."). But the wide latitude afforded to a prosecutor making a closing argument includes the leeway to draw reasonable inferences from the evidence. See *Styles v. State*, 308 Ga. 624, 629 (3) (842 SE2d 869) (2020). The prosecutor's statement asked the jury to draw a reasonable inference—supported by the undisputed evidence that Scruggs was a prostitute and

Bynum was a pimp—as to why Scruggs would have walked away with Green without any objection from Bynum. See *Varner v. State*, 285 Ga. 300, 301 (2) (c) (676 SE2d 189) (2009) (prosecutor's reference to victim as a "battered woman" was a permissible inference from the evidence). So the trial court did not abuse its discretion in overruling Ridley's objection to the prosecutor's statement.

*Judgment affirmed. All the Justices concur, except LaGrua, J., disqualified.*