NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia



Decided: April 16, 2024



S24A0117. THOMPSON v. THE STATE.



COLVIN, Justice.

Appellant Diante Thompson appeals his convictions for malice murder and other crimes related to the stabbing death of Bobby Jermaine Ricks.[1] On appeal, Appellant contends that the evidence

---

[1] Bobby Ricks died on October 11, 2017. On September 25, 2018, a Hancock County grand jury charged Appellant, Demarco Draughn, Benny Hayward, and Xavier Levatte with malice murder (Count 1), felony murder (Count 2), and aggravated assault (Count 3).

On June 20, 2019, Appellant filed a motion to sever Appellant's trial from his co-indictees' trial, which the trial court granted. Appellant's co-indictees were convicted of malice murder and other crimes, and their malice murder convictions were affirmed by this Court in *Draughn v. State*, 311 Ga. 378 (858 SE2d 8) (2021). Following a jury trial held from October 28 through October 30, 2019, the jury found Appellant guilty on all charges. On October 30, 2019, the trial court sentenced Appellant to life in prison without the possibility of parole for malice murder (Count 1). The felony-murder count (Count 2) was vacated by operation of law. Though the trial court purported to merge Count 3 into Count 2, Count 3 actually merged into Count 1, because Count 2 had been vacated. See *Favors v. State*, 296 Ga. 842, 848 (5) (770 SE2d 855) (2015).

Appellant timely filed a motion for new trial on November 8, 2019, and amended it through new counsel on February 10, 2023. Following a hearing on July 12, 2023, the trial court denied Appellant's amended motion for new trial

presented at trial was constitutionally insufficient to sustain his convictions and that the trial court erred by failing to grant a new trial on the general grounds, as provided in OCGA §§ 5-5-20 and 5-5-21. Appellant also argues that the State committed reversible error in its closing argument in two ways: by telling the jury that it needed to adjudicate the guilt of Appellant's co-indictees, who were tried separately, and by allegedly shifting the burden of proof to Appellant. Lastly, Appellant argues that his trial counsel was constitutionally ineffective for failing to object to the same allegedly improper statements made by the State referenced above. For the reasons stated below, we affirm Appellant's convictions.

1. The evidence at trial showed the following. Ricks was killed in the H-1 dormitory of Hancock State Prison on the evening of October 11, 2017. H-1 can house up to 96 inmates and was full or mostly full at the time of the crimes. Security camera footage of the

on July 14, 2023.

Appellant timely filed a notice of appeal to the Court of Appeals on August 11, 2023, and the case was transferred to this Court on September 1, 2023. This appeal was docketed to this Court's term beginning in December 2023 and submitted for a decision on the briefs.

common area in H-1 on the evening of October 11 was entered into evidence and played at trial. The video showed the following. The shower area of the H-1 dormitory contained six shower stalls, with three on the main floor and three on the second floor. At 11:13 p.m., Correctional Officer Erica Hood walked across the shower area, opened the door to the TV room, and spoke to various inmates, including an inmate who identified himself at trial as Jermel Tannahill.

A few minutes later, a group of five inmates gathered in the far corner of the common area and walked toward the shower stalls on the main floor. One of these inmates later identified himself to investigators and again at trial as Patrick Renfroe. As the inmates approached the showers, Renfroe stopped in front of his cell and stood looking out across the common area. The four remaining inmates continued walking without pause and entered the shower in which Ricks was bathing. There, they started to fight him. Ricks fought his way out of the shower stall and ran away, naked and bleeding, with the four inmates chasing him. Ricks ran toward the

exit, which is enclosed by a metal gate known as the "sally port" and fell to the ground. As Ricks laid on the ground, the four inmates stabbed him repeatedly with sharp metal objects.

Ricks quickly got off the floor, leaving a pool of blood on the ground, and ran back toward the showers. The attackers continued to chase Ricks. Ricks then cut back toward the sally port, which Officer Hood opened, and Ricks entered. The attackers dispersed back toward their cells. Ricks was transported by ambulance to the hospital shortly thereafter but died en route.

At trial, multiple witnesses testified about the identities of the four inmates who attacked Ricks. Officer Hood testified that she was the only correctional officer assigned to the floor of H-1 that night and that she was starting to lock the dormitory down for the evening when the fight broke out. She testified that she did not know the names of any of the attackers, but she recognized one as having "dark eyes, jagged teeth, and a receding hairline." Officer Hood

identified this attacker at trial as Appellant.[2]

Tannahill, one of the inmates who spoke to Officer Hood immediately prior to the attack, testified that he observed the fight from the TV room, which had six windows from which he could clearly see into the shower area. He testified that he knew one of the attackers by his tattoos and haircut and that he knew the others by their nicknames: "Golds," "Glock Nine," and "Jersey." Tannahill told GBI agents in an interview that the inmate he recognized by his tattoos and haircut was Demarco Draughn; "Golds" was the nickname for inmate Benny Hayward, who had gold teeth; "Glock Nine" was the nickname for Xavier Levatte, who had a laundry bag in his cell with "Glock Nine" written on it; and "Jersey" was Appellant's nickname.

An audio-recorded interview conducted by the Georgia Department of Corrections ("GDOC") of Renfroe, the inmate who

---

[2] Cross-examination revealed that Hood was unable to identify any of the attackers on the morning after Ricks was killed and that the first time she ever identified Appellant was months later, when she first met with the State.

walked with the attackers toward the showers but stopped and stood outside his cell, was admitted into evidence and played for the jury. In the interview, Renfroe identified each of the attackers, including Appellant.[3]

A correctional officer who tracked street gangs in Hancock State Prison testified regarding gang activity in H-1 and the gang-affiliation of the inmates who allegedly stabbed Ricks. He explained that the Bloods gang is divided into East Coast and West Coast Bloods; that there were multiple different sects of East Coast Bloods within the prison, including "Sex, Money, Murder," "G-Shine," and "Nine Trey"; that there was a sect of West Coast Bloods within the prison known as the "Inglewood Family Gangster Blood"; and that "Sex, Money, Murder" is also referred to as "Rollack." Ricks, Appellant, Draughn, and Hayward were Sex, Money, Murder or Rollack Bloods. Renfroe was an Inglewood Blood, and Levatte was a Nine Trey Blood. The officer explained that Bloods live by various rules, including a strict prohibition on homosexuality. The officer

---

[3] At trial, Renfroe stated that he could not remember who stabbed Ricks.

also explained that if a Blood gang member violates one of their rules, a "hit" is placed on him and that person is called a "dub."

As to the motive behind Ricks's murder, Renfroe and Tannahill both pointed to allegations that Ricks engaged in homosexual activity, which was prohibited by Ricks's gang. In Renfroe's interview with GDOC agents, Renfroe stated that Ricks was considered a "dub" by his gang because Ricks was believed to be engaging in homosexual activity and because he had allegedly been caught engaging in similar activity at his prior prison. The State also introduced into evidence an e-mail from Tannahill to his girlfriend in which he reported that Ricks was stabbed for engaging in homosexual activity.

Renfroe also pointed to Ricks's gang affiliation when explaining why he believed Ricks was killed. Renfroe explained that, generally, if Ricks was going to be punished for breaking the gang's rules, it would be by members of his own gang. Renfroe told GDOC agents that the attack, therefore, must have been a "Rollack call," and that there were only four to five members of Sex, Money, Murder

in H-1.

Gregory Johnson, Ricks's roommate at the time of the attack, testified that they had only been roommates for three days when Ricks was killed. Johnson explained that Ricks paid Johnson's former roommate to switch rooms so that Ricks could room with Johnson. Johnson also testified that Ricks and Appellant got into a verbal argument on the same day of the attack.

A crime scene specialist testified that he found a bucket filled with a foamy solution that smelled like bleach in Renfroe and Lavette's cell, cell 115, and that there were inmate uniform pants soaking in the solution. He also discovered that the white sink had a red tint to it, which he explained was likely caused by someone washing blood off himself in the sink.[4]

A special agent with GDOC testified that two homemade sharp objects, known as shanks, were found in a "pipe chase" beside cell 109 a week after the murder. The agent explained that a pipe chase

---

[4] The crime scene specialist testified that the sink was not tested for blood because the nature of sinks having "multiple things being washed inside [them]" can lead to a false positive.

is an area between two cells where inmates often hide things.

A GBI agent testified that DNA from the handle of one of the shanks found in the pipe chase near Draughn's cell (cell 109) matched Draughn's DNA and that DNA from the blade of that shank matched Ricks's DNA. She also testified that a drop of blood was found on the pants Hayward wore on the night of the attack.[5]

The medical examiner who conducted Ricks's autopsy testified that she found eleven stab wounds on his back, ribs, liver, and right kidney. She listed his cause of death as multiple sharp- force injuries. When shown pictures of the shanks recovered from the pipe chase, she testified that they could have caused the stab wounds.

2. Appellant argues that the evidence was constitutionally insufficient to support his convictions and that the trial court erred by denying Appellant's motion for new trial under OCGA §§ 5-5-20 and 5-5-21. Appellant conflates his sufficiency and general grounds claims in the argument section of his brief; the claims are "two distinct legal arguments" with "distinct legal standards." *Casey v.*

---

[5] The evidence did not indicate whose blood was on Hayward's pants.

*State*, 310 Ga. 421, 425 (2) (851 SE2d 550) (2020). We accordingly address each separately and hold that both claims fail.

(a) When evaluating the sufficiency of the evidence as a matter of constitutional due process, we view the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979); *Ward v. State*, 316 Ga. 295, 298 (2) (888 SE2d 75) (2023). "In this review, we do not weigh the evidence on appeal or resolve conflicts in trial testimony." *Ward*, 316 Ga. at 298 (2) (citation and punctuation omitted).

Viewed in the light most favorable to the verdicts, the evidence here shows that three eyewitnesses identified Appellant as one of the inmates who attacked Ricks: Officer Hood, Renfroe, and Tannahill. Though the quality of the security camera footage is inadequate by itself to confirm these identifications, it is consistent with the witnesses' accounts of the attack. Additionally, Ricks's

roommate, Johnson, testified that Appellant and Ricks, who were both members of the Sex, Money, Murder sect of the East Coast Bloods, had a verbal altercation in the hours before Ricks's murder. And Renfroe's statements during his recorded interview, together with Tannahill's e-mail to his girlfriend, indicated that Ricks was murdered by members of his own gang, including Appellant, for failing to follow the gang's rules prohibiting homosexuality. In Renfroe's interview, he stated that the "hit" on Ricks was made by Sex, Money, Murder Bloods.

This evidence was sufficient to uphold Appellant's convictions. See *Bates v. State*, 317 Ga. 809, 814-815 (2) (896 SE2d 581) (2023) (holding that the evidence was sufficient to support defendant's convictions of malice murder, felony murder, armed robbery, and other related offenses where eyewitnesses identified defendant as the shooter and physical evidence supported their testimony); *Ward*, 316 Ga. at 298-299 (2) (holding that the evidence was sufficient to support defendant's convictions of malice murder and aggravated assault of an inmate where another inmate testified that

11

defendant's gang put a "hit" on the inmate victim for a debt and identified defendant as one of the individuals who attacked the victim by stabbing him with a shank).

(b) Even when the evidence is legally sufficient to uphold a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence," OCGA § 5-5-21. See *Wilkerson v. State*, 307 Ga. 574, 574-575 (837 SE2d 300) (2019). When a defendant properly raises these grounds for new trial, commonly known as the "general grounds," the trial court exercises broad discretion to sit as the "thirteenth juror" and consider matters typically reserved to the jury, including conflicts in the evidence, witness credibility, and the weight of the evidence. *King v. State*, 316 Ga. 611, 616 (2) (889 SE2d 851) (2023). "The merits of a trial court's discretion on the general grounds are not subject to our review – that decision is vested solely in the trial court." *Lee v. State*, __ Ga. __ (897 SE2d 856) (2024) (citation and punctuation omitted). Where as here, Appellant argues

that the trial court erred in denying his motion for new trial based on the general grounds, his claim presents us nothing to review. See *Lee*, __ Ga. at __.[6]

3. Appellant next contends that the State committed reversible error by making two allegedly improper statements in closing argument. Appellant failed to preserve either claim for appellate review, however, so these claims fail.

First, Appellant argues that the State committed reversible error by telling the jury that it needed to determine the guilt or

---

[6] As noted in Division 2 above, Appellant raised both general grounds and constitutional sufficiency claims, albeit in a single enumeration of error. We addressed each claim separately because, as noted, they are "two distinct legal arguments" that "require the trial court to apply distinct legal standards." *Casey*, 310 Ga. at 425 (2). At times in the past, we have performed a *Jackson* sufficiency analysis in evaluating the general grounds. See, e.g., *Montgomery v. State*, 315 Ga. 467, 474 (3) (883 SE2d 351) (2023); *Bundel v. State*, 308 Ga. 317, 318-319 (1) (840 SE2d 349) (2020); *Lewis v. State*, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014).

Although many of us continue to "question whether it is proper for this Court to import *Jackson* into an appellate review of the general grounds (or to otherwise rely on *Jackson* as part of that analysis)," we need not resolve that issue today because Appellant raised both claims and because, as held in Division 2 (a), the evidence against Appellant was constitutionally sufficient to affirm his convictions. *King v. State*, 317 Ga. 611, 616 n.8 (2) (889 SE2d 851) (2023). See also *Blash v. State*, 318 Ga. 325, 334 (2) (b) n.6 (__ SE2d __) (2024); *Priester v. State*, 317 Ga. 477, 484 n.13 (3) (893 SE2d 751) (2023); *Muse v. State*, 316 Ga. 639, 653 n.6 (4) (889 SE2d 885) (2023).

innocence of Appellant and his co-indictees: Lavette, Hayward, and Draughn, whose trial had been severed from Appellant's. To account for this procedural history, the trial judge and the parties reached an agreement at the charge conference on the following jury instruction: "[t]hough you may consider all the evidence as a whole, you, the jury, must determine the guilt or innocence of [Appellant] only, and you are not to consider the three co-defendants contained in this indictment." Notwithstanding the State's assent to the trial court's agreed-upon instructions, the prosecutor made the following statement to the jury in closing argument:

> You all are here to make the determination about this indictment. Let me tell you about your decisions, and that's all you have to decide. In Count One, whether Demarco Michael Draughn, Benny Hayward, Xavier Connell Levatte, and the Defendant before the Court, [Appellant] committed malice murder in Count One.

Defense counsel did not object to the prosecutor's comment or request a curative instruction. Following the parties' closing arguments, the trial court instructed the jury as previously agreed. A copy of the indictment with the co-indictees' names redacted from

14

it was given to the jury to consider during its deliberations.

Second, Appellant argues that the State committed reversible error because the prosecutor stated in his closing argument that "there has been no evidence exonerating [Appellant], [and] there has been no evidence pointing to somebody else as being the real killer." Defense counsel did not object to the prosecutor's comment or request a curative instruction.

Because defense counsel failed to object to either of the prosecutor's allegedly improper statements in closing arguments at trial, neither claim is preserved for appellate review. See *Moon v. State*, 311 Ga. 421, 426 (4) (858 SE2d 18) (2021) (holding that appellant's claim was unpreserved for appellate review because defense counsel did not object to the alleged error made in closing and explaining that "we do not review unpreserved challenges to closing arguments in non-death penalty cases, even for plain error").

4. Lastly, Appellant argues that his trial counsel was constitutionally ineffective by failing to object to the two allegedly improper statements made by the prosecutor described in Division

3, above. For the reasons that follow, Appellant's claim lacks merit.

To obtain relief based on a claim of ineffective assistance of counsel, a defendant generally must show both that his counsel's performance was constitutionally deficient and that this deficient performance prejudiced him. See *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Monroe v. State*, 315 Ga. 767, 781 (6) (884 SE2d 906) (2023). "If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other." *Monroe*, 315 Ga. at 781 (6).

(a) Assuming without deciding that defense counsel was deficient in failing to object to the prosecutor's statement regarding the jury's duty to assess the guilt of Appellant's co-indictees, Appellant has failed to show a reasonable probability that the result of his trial would have been different but for the statement. First, any harm caused by the comment was mitigated by the trial court's issuance of the previously agreed-upon jury instruction and its use of a redacted indictment that did not contain the co-indictees' names. Second, there was ample evidence of Appellant's guilt, as

three eyewitnesses identified Appellant as one of the attackers. Considering the trial court's instruction to the jury, the redacted indictment, and the strength of the evidence against Appellant, we cannot say that, had defense counsel objected, there is a reasonable probability that the result of Appellant's trial would have been different. See *Walker v. State*, 312 Ga. 232, 242 (4) (c) (iv) (862 SE2d 285) (2021) (holding that appellant's ineffective-assistance claim fails because even though the prosecutor's comment "comes uncomfortably close to – and may well cross over – the boundaries of permissible argument," appellant failed to show that there was a reasonable probability the result of his trial would have been different "in light of all the evidence presented"); *Draughn*, 311 Ga. at 383-384 (2) (b) (holding that appellant failed to show that he was prejudiced by defense counsel's failure to object to the prosecutor's allegedly improper statement where the alleged error "was cured by the trial court's instructions to the jury" and the evidence was "plainly sufficient").

(b) As to the prosecutor's comment in closing that "there has

been no evidence exonerating [Appellant], [and] there has been no evidence pointing to somebody else as being the real killer," defense counsel was not deficient in failing to object to the State's comment. "A prosecutor is granted wide latitude in the conduct of closing argument." *Scott v. State*, 290 Ga. 883, 885 (2) (725 SE2d 305) (2012). "A closing argument is to be judged in the context in which it is made." *Booth v. State*, 301 Ga. 678, 686 (4) (804 SE2d 104) (2017). Further, "[w]hether to object to a particular part of a prosecutor's closing argument is a tactical decision, and counsel's decision not to make an objection must be patently unreasonable to rise to the level of deficient performance." *Cochran v. State*, 305 Ga. 827, 833 (2) (c) (828 SE2d 338) (2019) (citation and punctuation omitted).

Viewed in context, the prosecutor was simply highlighting that Appellant's theory of the case—that someone other than Appellant was the fourth attacker—was illogical based on the evidence. In this context, the prosecutor's comment that "there has been no evidence exonerating [Appellant], [and] there has been no evidence pointing

18

to somebody else as being the real killer" did not improperly shift the burden to Appellant to prove his innocence, and the statement was therefore not improper. See *Ridley v. State*, 315 Ga. 452, 457-458 (4) (a) (883 SE2d 357) (2023) (holding that prosecutor's statement in closing that defendant had the same power to subpoena witnesses as the State did not improperly shift the burden of proof to defendant, but rather was a proper comment on defendant's failure to present evidence); *Kimbro v. State*, 317 Ga. 442, 452 (7) (893 SE2d 678) (2023) (holding that there was no error arising from prosecutor's statement in closing that "there is no defense raised by this evidence" and explaining that such comments did not amount to improper burden shifting); *Johnson v. State*, 271 Ga. 375, 383 (15) (a) (519 SE2d 221) (1999) (holding that prosecutor's "make them explain" argument in closing was not an improper shifting of the burden of proof). Because the statement was not improper, defense counsel was not deficient for failing to object to the prosecutor's statement. See *Gatson v. State*, 307 Ga. 634, 640 (2) (b) (837 SE2d 808) (2020) (noting that failure to raise a meritless objection is not

19

evidence of ineffective assistance).

Because Appellant has failed to show prejudice resulting from the prosecutor's failure to object to the prosecutor's statement regarding the jury's duty to assess the guilt of Appellant's co-indictees and because Appellant has failed to show that his trial counsel was deficient for failing to object to the prosecutor's allegedly burden-shifting comments, Appellant's ineffective-assistance claims fail.

*Judgment affirmed. All the Justices concur.*