NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

# In the Supreme Court of Georgia

Decided: September 17, 2024

S24A0670.  PYNE v. THE STATE

LaGrua, Justice.

Appellant Jacob Pyne appeals his convictions for malice murder and other crimes related to the July 6, 2016 shooting death of Gerard Foster.[1]  On appeal, Pyne contends that his trial counsel provided ineffective assistance at trial and that the trial court erred

---

[1] On October 6, 2016, a DeKalb County grand jury indicted Pyne for malice murder (Count 1), two counts of felony murder (Counts 2 and 3), aggravated assault (Count 4), possession of a firearm by a convicted felon (Count 5), and possession of a firearm during the commission of a felony (Count 6). A jury trial was held on May 30, 2017, through June 2, 2017, and the jury found Pyne guilty of all counts. The trial court sentenced Pyne to life in prison without the possibility of parole on the malice murder count (Count 1), five years to serve to run concurrent with Count 1 on the possession of a firearm by a convicted felon count (Count 5), and five years to serve to run consecutive to Count 1 on the possession of a firearm during the commission of a felony count (Count 6). All other counts were merged or vacated by operation of law. Pyne filed a timely motion for new trial, which was amended through new counsel. After holding an evidentiary hearing, the trial court denied the motion for new trial on January 3, 2024. Pyne filed a timely notice of appeal to this Court, and the case was docketed to the April 2024 term and submitted for a decision on the briefs.

by overruling Pyne's objection to certain statements the prosecutor made during his closing argument and by failing to give a curative instruction in response to those statements. Seeing no merit to these claims, we affirm Pyne's convictions.

The evidence presented at trial established that, around 6:00 a.m. on July 6, 2016, Pyne, Christoyna Section,[2] and K.C.—two women who worked as prostitutes for Pyne—were riding around the Decatur area in K.C.'s black Chevrolet Impala. K.C. was driving the car, and at Pyne's direction, she drove the group to an apartment complex. K.C. and Section testified that they had never been to this apartment complex before and did not know why they were there that morning. K.C. parked the car on a nearby street, and Pyne ordered Section to get out of the car because he had been arguing with her. Section exited the car, and after about 20 minutes, Pyne exited the vehicle as well, telling K.C. to "wait on him."

Pyne and Section walked over to the apartment complex and

---

[2] Section was indicted as a co-defendant in this case, and she later entered a guilty plea, which is not a part of the record on appeal.

sat down on the stairs leading up to the apartments. Section testified that she and Pyne started arguing again, and after about 45 minutes, Pyne began "clutching at his waistline where he ke[pt] his gun"—a gun she saw him carrying that morning. Section testified that she "was trying to calm [Pyne] down," and as she was doing so, she "s[aw] a figure of a man coming down the steps." Section heard the man—later identified as Foster—say to Pyne, "Excuse me, Young Brother." According to Section, Pyne told her that "[she] better not move," and he turned towards Foster and began insulting and yelling at him. While Pyne was shouting at Foster, Section "took that chance to run," testifying that "[Pyne] had scared [her] when he was clinching at his waist . . . [and] was talking crazy, looking deranged." Section testified that, as she was running away, she "heard shots," and she "ran to [K.C.'s] car" because she "wasn't sure if [Pyne] was shooting at her."

K.C., who had been waiting in the car, saw Section running towards the car, with Pyne right behind. Section and Pyne entered the car, and K.C. drove the group back to the hotel where they were

staying. K.C. testified that, when Pyne entered the car, he was holding a gun, but K.C. never saw Section with a gun. Section testified that, when they returned to the hotel, Pyne told her and K.C. that he "watch[ed] a motherf**ker take their last breath." A short time later, Pyne "grabbed [K.C.'s] keys" and "took [her] car." Section later turned herself in to law enforcement when she learned that she was wanted in connection with a murder.

Around 8:00 a.m., law enforcement officers with the City of Decatur Police Department were dispatched to the apartment complex. One of the responding officers testified that, when he arrived at the apartment complex, he saw Foster "lying on the stairwell" leading to the apartments and observed that Foster "wasn't responding" and "was bleeding heavily." Several .40 caliber shell casings—later determined to have been "fired from the same firearm"—were located around Foster's body, but the murder weapon was never recovered by law enforcement officers. At trial, the medical examiner testified that Foster was shot four times and that the cause of death was "gunshots of the head, neck, and torso."

4

During their investigation that morning, law enforcement officers obtained surveillance video recordings from cameras installed around the exterior of the apartment complex, and the recordings were played for the jury at trial. The surveillance video recordings showed a black Chevrolet Impala driving around the parking lot of the apartment complex prior to the shooting, and shortly thereafter, the same car drove over and parked on an adjacent side street, with a woman exiting the car at 6:20 a.m. and a man exiting the car at 6:40 a.m. The Impala remained parked on the nearby street until 7:57 a.m., at which point the surveillance video recordings captured the same two individuals who previously exited the Impala running back towards and entering the car, which then sped away. From these surveillance video recordings, officers obtained the Impala's tag number and learned that the car was registered to K.C.

Later on July 6, law enforcement officers located K.C.'s Impala at a residence connected to Demarcus White, a friend of Pyne's, and they towed the vehicle to department headquarters. After obtaining

a search warrant and conducting a search of the vehicle, law enforcement officers located Pyne's cell phone and a credit card in his name inside the vehicle. Law enforcement officers obtained a search warrant for Pyne's cell phone, and a data extraction of the cell phone revealed that, on July 1, 2016—five days before the shooting—the cell phone had been used to take a photograph of the outside of Foster's apartment at the apartment complex, and the photograph also captured what was later determined to be Foster's car. Additionally, the data extraction revealed that Pyne's cell phone had been in the general proximity of the apartment complex at the time of the shooting, and the apartment complex's address had been entered into the phone's GPS system on the morning of July 6.

On July 7, 2016, the day after the shooting, law enforcement officers interviewed White over the telephone, and the interview was recorded and played for the jury at trial. White also testified at trial. During that phone interview, White stated that, on July 6, Pyne drove K.C.'s vehicle to the home of one of White's friends, and Pyne told White that he "f**ked up" and "f**ked around and shot a deacon

6

at a church."[3] Pyne was in possession of a gun at that time, and he tried to give the gun to White, who refused to take it. While Pyne was inside the house, law enforcement officers arrived and towed K.C.'s car, and Pyne expressed concern that his cell phone was inside the car. White told law enforcement officers during the interview on July 7 that, based on his conversation with Pyne, Pyne was "about to leave to go to Tennessee" and that Pyne's "girlfriend [was] on the way to come get him." On July 9, 2016, Pyne was arrested in Knoxville, Tennessee at the home of his girlfriend.

1. Pyne first contends that his trial counsel provided ineffective assistance by failing to object when the State allegedly pursued inconsistent theories of prosecution at trial. For the reasons that follow, Pyne's claim of ineffective assistance of counsel fails.

"To prevail on a claim of ineffective assistance of counsel, a defendant generally must show that counsel's performance was

_____

[3] At trial, Foster's wife testified that Foster was ordained as a deacon in their church.

7

deficient, and that the deficient performance resulted in prejudice to the defendant." *Moss v. State*, 311 Ga. 123, 126 (2) (856 SE2d 280) (2021) (citing *Strickland v. Washington*, 466 U.S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984)). "To prove deficient performance," a defendant "must show that his counsel performed in an objectively unreasonable way considering all the circumstances and in light of prevailing professional norms." *Ward v. State*, 313 Ga. 265, 273 (4) (869 SE2d 470) (2022) (citation and punctuation omitted).

> The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course.

*Taylor v. State*, 312 Ga. 1, 15-16 (6) (860 SE2d 470) (2021) (citations and punctuation omitted). See also *Robinson v. State*, 278 Ga. 31, 36 (2) (d) (597 SE2d 386) (2004) ("As a general rule, matters of reasonable trial tactics and strategy, whether wise or unwise, do not amount to ineffective assistance of counsel," and "[a] reviewing court evaluates trial counsel's performance from counsel's perspective at

8

the time of trial."). Our assessment is an objective one, not based on the subjective views of trial counsel. See *Lane v. State*, 312 Ga. 619, 623 (2) (a) (864 SE2d 34) (2021) (noting that "we are not limited in our assessment of the objective reasonableness of lawyer performance to the subjective reasons offered by trial counsel for his conduct") (citation omitted).

"To satisfy the prejudice prong, a defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Moss*, 311 Ga. at 126 (2). "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." Id. (citation and punctuation omitted).

As mentioned above in footnote 2, Section was indicted as a co-defendant in this case, and she entered a guilty plea[4] after Pyne's trial. Section was compelled to testify at Pyne's trial by an order of testimonial immunity. Section testified about this immunity

---

[4] The record does not reflect the crimes to which Section pleaded guilty.

9

agreement during the State's direct examination of her at trial, and she testified that she did not receive a deal in exchange for her testimony. At Pyne's request, the trial court also instructed the jury regarding immunity agreements.

During the State's direct examination of Section, the prosecutor asked Section if she "kill[ed] anybody," and she responded, "No, sir." The prosecutor then asked whether Section "played a role in the murder" of Foster, to which Section responded, "Not knowingly, sir." The prosecutor asked Section if she "voluntarily participate[d] in" Foster's murder and/or was "trying to get back at him for something," and Section replied, "No, sir" and testified that she did not know Foster. During cross-examination, defense counsel pointed to Section's statement on direct that she was not "involved in the murder" and asked her whether "the State disagree[d]" with this statement since she was "obviously a defendant in this case, right?" Section responded, "Yes, sir."

On appeal, Pyne contends that, because the State indicted Section as Pyne's co-defendant and also elicited testimony from

Section at trial that "she was in no way involved with any of the criminal acts appearing in the indictment," the State "presented and argued" two "contradictory" and "inconsistent theories of prosecution in the same trial." Pyne further contends that his "[t]rial counsel's failure to object" to the State's presentment of allegedly inconsistent theories and failure to argue that this line of questioning violated Pyne's due process rights was "objectively unreasonable," and that, "absent trial counsel's ineffective assistance," the outcome of the proceedings would have been different. We disagree.

As an initial matter, this Court has not affirmatively held that the State's use of inconsistent theories against two separately tried defendants charged with the same crimes violates a defendant's state or federal due process rights. *Moody v. State*, 316 Ga. 490, 539 (9) (888 SE2d 109) (2023) ("In the past, we have assumed that there could be a due process problem if the State uses inherently factually contradictory theories, while at the same time we have noted that there is perhaps some doubt as to whether such a due process right

11

exists." (citation and punctuation omitted)). See also *Battle v. State*, 305 Ga. 268, 274 (2) (b) (824 SE2d 335) (2019) (noting that the Eleventh Circuit has "cast[] doubt on whether such a due process right exists") (citing *United States v. Hill*, 643 F3d 807, 832-834 (11th Cir. 2011)). Pyne concedes as much on appeal, noting that "[i]t has not been established conclusively that the State pursuing inconsistent theories of prosecution that were contradictory and contained inconsistent factual premises in separate trials of co-defendants violates a [d]efendant's due process rights. . . ."

What is more, while Section was indicted with Pyne for crimes connected to Foster's murder, she never went to trial on those charges because she entered a guilty plea. By contrast, in the cases where we previously addressed the use of inconsistent theories by the prosecution, the State had allegedly used inconsistent theories to prosecute multiple defendants for the same crime in *separate* trials. See *Moody*, 316 Ga. at 539-540 (9). See also *Battle*, 305 Ga. at 272 (2) (a). Pyne acknowledges that there were no separate trials here, but he nevertheless argues—without supporting legal

12

authority—that his trial counsel should have objected and argued that Pyne's due process rights were violated because "[t]he State presented two inconsistent theories during the trial of [Pyne's] case itself."

The State's contention that Pyne was the shooter, while also questioning Section about what she witnessed and what her potential involvement in the shooting might have been, did not amount to the presentment of "inherently factually contradictory theories" against Pyne at his trial. See *Battle*, 305 Ga. at 274 (2) (b). And Pyne's trial counsel did not perform deficiently by failing to pursue this argument because there was no clearly-established due process objection to make. See *State v. Spratlin*, 305 Ga. 585, 593 (2) (a) (826 SE2d 36) (2019) (concluding that trial counsel's failure to object to an unsettled question of law was not deficient performance). See also *Moody*, 316 Ga. at 539-540 (9).

Because we conclude there was no deficiency in trial counsel's performance here, we need not examine the prejudice prong. See *Thomas v. State*, 311 Ga. 706, 712 (1) (b) (859 SE2d 14) (2021) ("If

13

the defendant fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test." (citation and punctuation omitted)). Based on the above, Pyne's argument that his trial counsel provided ineffective assistance fails.

2. Pyne also contends that the trial court committed reversible error by overruling Pyne's objection to certain statements the prosecutor made during his closing argument and by failing to give a curative instruction to the jury regarding those statements. Specifically, Pyne claims that, during the State's closing, the prosecutor referred to comments made by defense counsel in Pyne's closing about Foster's visits to pornographic and adult dating websites the day before he was killed. Pyne asserts that the prosecutor allegedly argued that, if Pyne had wanted the jury to consider Foster's web searches and how they connected Foster to Section, Pyne should have produced more evidence of that connection at trial. Pyne contends that these statements by the prosecutor "amounted to impermissible burden shifting" and a "comment on [Pyne's] right to remain silent." We see no abuse of the

14

trial court's discretion in this regard.  See *Moore v. State*, 307 Ga. 290, 297 (5) (835 SE2d 610) (2019) (concluding that "a prosecutor is granted wide latitude in the conduct of closing argument, the bounds of which are in the trial court's discretion") (citation and punctuation omitted).

To assess Pyne's claim that the prosecutor's statements amounted to impermissible burden-shifting and a comment on his right to remain silent, we must look at those statements in context. See *Adams v. State*, 283 Ga. 298, 302 (3) (e) (658 SE2d 627) (2008) ("Closing arguments are judged in the context in which they are made.").  As relevant here, that means we not only look at the closing argument in which the allegedly offending statements were made, but also the jury instructions that preceded them. See *Johnson v. State,* 312 Ga. 481, 490-491 (3) (863 SE2d 137) (2021) (considering the trial court's preliminary instructions, as well as the final charge, to determine whether the jury was "adequately informed" of the applicable law).

After the trial court swore the jury in, the trial court gave the

15

jury preliminary instructions, which included the following: (1) "[t]he defendant is presumed innocent until he is proven guilty"; (2) "[t]he defendant enters upon the trial of the case with a presumption of innocence in his favor," which "remains with the defendant until it is overcome by the State with evidence that is sufficient to convince you beyond a reasonable doubt that the defendant is guilty of the crime or crimes charged"; (3) "[t]he burden of proof rests upon the State to prove every material allegation of the indictment and every essential element of the crimes charged beyond a reasonable doubt"; (4) "[t]here is no burden of proof upon the defendant whatsoever, and the burden never shifts to the defendant to prove his innocence"; and (5) "[i]f the State fails to prove the defendant's guilt beyond a reasonable doubt, it would be your duty to acquit the defendant."

During Pyne's opening statement, defense counsel told the jury that it would hear "undisputed testimony that Mr. Pyne ha[d] absolutely no connection with Mr. Foster" and that "Mr. Foster had a somewhat secretive past." Defense counsel explained to the jury

16

that Foster, who was "by all accounts, a strong Christian" also had "another side" that it would "hear about"—"a side his own wife didn't know about." Defense counsel then advised the jury that Foster's "cell phone records" would be presented at trial and would reveal that "[Foster] was looking at a number of websites," including "dating websites" and "pornographic websites up until the day before he was shot." And defense counsel emphasized that Foster's visits to these websites, particularly the dating website, would show "the connection with Ms. Section" because "[h]ere you have someone who's living a secret life, dating websites, and a prostitute," and this "connection" gave "Ms. Section the motive" to shoot Foster—the "motive Mr. Pyne [did]n't have."

At trial, the State called Lisa Arnold, a GBI digital forensic investigator, to testify regarding her examination and data extraction of Pyne's cell phone. During Pyne's cross-examination of this witness, defense counsel questioned Investigator Arnold about whether she had also performed a data extraction of Foster's cell phone, which was collected during the investigation, and she

17

indicated that she had done so. Investigator Arnold testified that the data extraction from Foster's cell phone demonstrated that a user of the cell phone visited multiple pornographic websites and a dating website in the weeks and days before the shooting.[5] This evidence was the only evidence presented at trial concerning Foster's alleged visits to pornographic and dating websites or establishing that Foster's cell phone had been utilized to visit such websites. Additionally, Section testified at trial that, although she worked as a prostitute, she never had "any dates" with Foster, she did not know Foster, and she had never seen Foster or been to the apartment complex where Foster lived before the morning of the shooting.

Nevertheless, during Pyne's closing argument, defense counsel argued that, because Section was a "known prostitute" and because Foster had a secret side" in which he "visited pornographic sites" and "adult dating sites," Section and Foster likely had a "connection." Highlighting that the "undisputed evidence" showed

---

[5] Excerpts from the data extraction of Foster's cell phone summarizing this web history were admitted into evidence at trial.

that "Section was there" when the shooting occurred, defense counsel argued that it made "all the sense in the world" for Section to have been the shooter. Defense counsel emphasized that Section was not "trustworthy" or "credible" and the jury could not "expect her to come in here and tell the truth when she's got another person's life in her hand." Defense counsel argued that, "if anyone ha[d] a motivation to maybe not be forthright with the truth," it would be Section, who was "facing down the barrel of a murder conviction" and would want to "distance" herself or "minimize [her] role" in the shooting of Foster. Defense counsel conceded that the State did "not have to prove motive" in this case, but argued that "[t]here ha[d]n't been any evidence introduced" at trial to give the jury "the why[,] . . . at least not with respect to Mr. Pyne," and no apparent connection between Pyne and Foster had been made. Defense counsel then reminded the jury that, according to one of the investigators who testified at trial, "random killings are very rare," arguing that, "typically, people have to have some connection, some relationship, something of that nature" for a murder to occur, and

"Ms. Section ha[d] that."

The prosecutor made the following statements in his closing argument:

> [T]he only evidence presented—it's not really evidence—[was] that there [were] some dating sites on a phone and some pornographic websites on a phone. We don't know where they came from. There's no connection to Christonya Section. She was very candid and frank about what her profession was. When she testified, she didn't hold anything back. She told you the website that she uses is BackPage.com. There was no information about BackPage.com presented to you on Mr. Foster's phone at all. So, that is to be completely stricken from your consideration because you've not seen anything, any connection to a prostitute being responsible. . . . And then there [were] some page[s] of web history [that] [were] submitted in evidence. We don't know who generated it. We don't know. There was no profile, a dating profile that was presented. There was no number. There was nothing. And, if there had been you would have seen it. . . . You didn't see it because it doesn't exist.

Defense counsel objected on the grounds that the prosecutor's comment amounted to "burden shifting." The trial court overruled the objection.

On appeal, Pyne argues that the prosecutor's comments on the defense's failure to introduce evidence of a connection between

20

Foster and Section amounted to "impermissible burden shifting" because "the clear conclusion the jury was left to draw was that [Pyne] bore the responsibility of producing evidence of the existence of a dating profile or some other information" in order for the jury to consider Pyne's theory that Section was the shooter. Pyne further argues that the prosecutor's remarks were improper because the jury would naturally interpret such remarks as a comment on Pyne's right to remain silent and not to testify, and the trial court should have given a curative instruction to the jury regarding these statements by the prosecutor. We disagree because, in context, the State's comments would not have reasonably been understood as impermissible burden-shifting or a comment on Pyne's right to remain silent in this case.

"A closing argument is to be judged in the context in which it was made." *Thompson*, 318 Ga. at 767 (4) (b) (citation and punctuation omitted).

> Indeed, a prosecutor may not comment on the failure of a defendant to testify, but he may argue that evidence showing guilt has not been rebutted or contradicted[.]

21

> Moreover, a prosecutor is entitled to emphasize the evidence favorable to the State, to discuss and draw inferences from factual matters in evidence relating to the credibility of witnesses, and *to respond to points made in—and issues omitted from—the defendant's closing argument.*

*Blaine v. State*, 305 Ga. 513, 519 (2) (826 SE2d 82) (2019) (citation and punctuation omitted; emphasis supplied). "A prosecutor has wide latitude in the conduct of a closing argument, the bounds of which are in the trial court's discretion. And where the defense presents no evidence to rebut the evidence of guilt, it is not improper for the prosecutor to point out that fact to the jury." *Ridley v. State*, 315 Ga. 452, 458 (4) (a) (883 SE2d 357) (2023) (concluding that the prosecutor's statement in closing argument that the defendant had the same power to subpoena witnesses as the State did not improperly shift the burden of proof to the defendant, but were "proper comments on the defense's failure to present evidence") (citations and punctuation omitted). See also *Thompson*, 318 Ga. at 767 (4) (b) (holding that "the prosecutor's comment that 'there has been no evidence exonerating Appellant, and there has been no

evidence pointing to somebody else as being the real killer' did not improperly shift the burden to Appellant to prove his innocence," and "the statement was therefore not improper") (citation and punctuation omitted)).

Viewing the State's closing argument in this context, the prosecutor's comments on the lack of evidence showing a connection between Section and Foster did not shift any part of the State's burden to the defense, but merely pointed out that the defense's attempt to use Foster's internet history to connect him and Section did not show any such connection on closer scrutiny. In other words, these comments "simply highlight[ed]" that Pyne's theory of the case—i.e., that Section was the shooter—was "illogical based on the evidence," *Thompson*, 318 Ga. at 768 (4) (b), and "emphasized to the jury" that Pyne failed to "successfully rebut[] or explain [] the State's evidence" demonstrating that Pyne was the shooter. *Kimbro v. State*, 317 Ga. 442, 452 (7) (893 SE2d 678) (2023) (holding that there was no error arising from the prosecutor's statement in closing that "there [was] no defense raised by this evidence" and explaining that

23

such comments did not amount to improper burden-shifting).

As to Pyne's contention that the prosecutor's statements were a comment on his right to remain silent, this Court determines "whether a prosecutor has improperly commented on an accused's right to remain silent" by evaluating "whether the prosecutor's manifest intention was to do just that or whether the remarks were such that a jury would naturally and necessarily take the remarks to be a comment on the accused's right to remain silent and not to testify." *Kilgore v. State*, 300 Ga. 429, 432 (2) (796 SE2d 290) (2017). Here, the State did not "improperly comment[]" on Pyne's "decision not to testify." *Blaine*, 305 Ga. at 519 (2). The prosecutor's statements were not directed at Pyne's "right to remain silent, i.e., his decision not to testify; they were in response to the defense argument regarding the State's case and the defense's failure to counter the State's evidence." *Kilgore*, 300 Ga.at 432 (2). Additionally, the trial court's thorough and accurate instructions to the jury "on the presumption of evidence, the State's burden of proof, and reasonable doubt," *Kimbro*, 317 Ga. at 452 (7), at the outset of

the trial would reasonably have informed the jury's understanding of the prosecutor's statements.

Accordingly, we conclude that the prosecutor's "statements were within the bounds of proper closing argument, and the trial court did not abuse its discretion" by overruling Pyne's objections to them. *Ridley*, 315 Ga. at 458 (4) (a). "Moreover, because the State's closing was proper, a sua sponte curative instruction by the trial court would not have been warranted." *Blaine*, 305 Ga. at 519 (2). Therefore, this contention also fails.

*Judgment affirmed. All the Justices concur.*