**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: March 3, 2026

S25A1107.  STRONG v. THE STATE.

LAGRUA, Justice.

Appellant Aaron Edward Strong challenges his 2023 convictions for felony murder and other crimes in connection with the fatal stabbing of his wife's 32-year-old son, Maurice Arnold, and the stabbing of her 22-year-old grandson, Deandre Arnold.[1] This

---

[1] The crimes occurred on August 24, 2015. On June 8, 2017, a Cobb County grand jury indicted Strong on seven counts arising out of the death of Maurice and the stabbing of Deandre. At a trial in 2017, Strong was convicted of felony murder in the death of Maurice, two counts of aggravated assault, and two counts of possession of a knife during the commission of a felony but was acquitted on two counts: malice murder in Maurice's death and aggravated battery against Deandre. This Court reversed. See *Strong v. State*, 309 Ga. 295 (2020). From February 6 to 9, 2023, Strong was retried on the counts on which he was convicted in the 2017 trial: felony murder, two counts of aggravated assault, and two counts of possession of a knife during the commission of a felony. The jury found him guilty of all charges. The trial court sentenced Strong to serve life in prison without the possibility of parole for the felony murder of Maurice, a consecutive term of 20 years in prison for the aggravated assault against Deandre, and two consecutive five-year prison terms for the knife-possession counts. The other aggravated assault verdict merged into the felony murder conviction. Strong filed a timely motion for new trial, which he

Court reversed Strong's convictions after his first trial. See *Strong v. State*, 309 Ga. 295 (2020). In challenging his convictions arising from his second trial, Strong contends that (1) the trial court abused its discretion in excluding text messages sent to Maurice shortly before his death; (2) the trial court abused its discretion in allowing the prosecutor, in closing argument, to refer to Strong's refusal on cross-examination to demonstrate how the stabbings occurred; (3) the trial court erred in failing to charge the jury on mistake of fact; and (4) his trial counsel was constitutionally ineffective with respect to the text messages and in failing to object when the prosecutor referred repeatedly to Strong's testimony from his first trial. As explained below, these claims fail, and we affirm.

The evidence presented at trial showed that the stabbings occurred late in the evening on August 24, 2015, at the Cobb County home where Strong and his wife Felicie Strong lived with Maurice

---

amended twice through new counsel. After an evidentiary hearing on July 15, 2024, the trial court entered an order denying the motion on August 12, 2024. Appellant filed a timely notice of appeal, and the case was docketed in this Court to the August 2025 term and oral argument was held on August 27, 2025.

and Deandre.[2] Strong had a troubled relationship with Maurice and Deandre. Although sometimes they got along, there were frequent arguments due to Strong "try[ing] to control [Felicie] and the house" and Strong's dissatisfaction with Maurice's and Deandre's failure to move out and become independent. According to Felicie, when Strong was drinking, his controlling attitude worsened.

The day before the stabbings, Strong and Felicie returned home late in the evening after a weekend trip to Florida. The following day, Strong went to a friend's house for a few hours, and when he returned, he appeared to be drunk, although Strong and his friend testified that Strong had consumed only two shots of bourbon. After returning home, Strong began to berate Deandre about dirty dishes that remained in the sink over the weekend. Deandre went to his bedroom, where his friend Taylor Durand was, and Strong followed him and continued his "tirade," forcefully

---

[2] Because this case involves questions of harmless error and prejudice stemming from ineffectiveness of counsel, we set out the evidence in detail and weigh it as we would expect reasonable jurors would have, instead of viewing it in the light most favorable to the jury's verdicts. See *Wallace v. State*, 320 Ga. 272, 273 n.2 (2024).

3

pushing open the door. Maurice heard the argument and confronted Strong, telling him "you're not going to bully" Deandre. The argument between Strong and Maurice continued, and the two men got into a "pushing contest."

Aaron Day, a neighbor who had been playing video games online with Maurice when the argument started, came over "to make sure everything was okay," after hearing "very loud yelling" through his game console headset and becoming concerned by how heated the argument sounded. Day tried to intervene between Maurice and Strong after he "realized the intensity" of the argument. As the argument continued, Felicie left the house because she could not "calm them down" and "[t]hey won't shut up. They don't listen." She drove to a nearby parking lot and sat in her car, planning to "stay gone long enough for them to cool off."

After Felicie left, Day walked outside with Maurice, Deandre, and Durand. Durand decided to go home, and Day, Maurice, and Deandre decided to go to Day's house and "cool down." Strong came out to the front porch and yelled to Maurice and Day, saying "I got

4

something coming for both of y'all . . . from Miami.[3] Just wait on it; just wait on it." Maurice responded, "That's some b**tch s**t" … [w]e're leaving." However, Deandre and Maurice decided to collect some of their belongings before leaving and went back inside the house; when Maurice went back inside, he did not have anything in his hands. Day stayed outside in the yard, and Strong remained on the front porch.

A few minutes later, as Maurice exited the house and walked by Strong, Strong "lunged" at Maurice, and Maurice hunched over and began screaming, "Help, help, he's stabbing me!," as Strong stabbed him with a large hunting knife with a seven-inch blade.[4] Deandre rushed outside and saw Strong pinning Maurice in the corner of the porch and stabbing him repeatedly. As Deandre tried to pull Strong away from Maurice, Strong started stabbing Deandre, too. Day started to run up to the porch, but Maurice yelled at him

---

[3] Strong was born in Miami.
[4] Day admitted that in prior testimony he had described the fight on the porch as a "bar fight" and that after the stabbings, Maurice and Deandre "slammed" Strong down on the porch.

not to come up but to call 911, which Day did. Although Deandre was stabbed multiple times, he was able to force Strong to the ground, and eventually, Strong dropped the knife. Deandre had a folding pocketknife in his pocket, but "it didn't dawn on [him]" to use it. Day testified that Maurice and Deandre were unarmed. Deandre crawled off the porch, called Felicie, and told her that Strong stabbed Maurice.[5]

After Deandre called Felicie, she returned home quickly. She saw Maurice lying on the porch, and as she walked up to the porch and reached out to touch him, Strong "jumped out with a knife and pointed it at" her, saying, "See what you made me do? This is your fault."

When police officers arrived at the house, Strong was on the porch looking over the banister; he was "very, very, very, calm" and "somewhat nonchalant about the situation." Strong told the officers

---

[5] Day spoke to police at the scene and later at police headquarters. His statement at police headquarters was audio- and video-recorded, and a portion was played for the jury. Police interviewed Deandre several days after the stabbing while he was still in the hospital, recovering from surgery, and a portion of the audio-recording of the interview was played at trial.

the knife was on the banister, and he complied with the officers' commands to come off the porch and lay on the ground with his hands visible. Strong told officers that "someone" had tried to kill him, but officers did not observe any visible injuries on him and did not recover any weapons other than the hunting knife, which appeared to have blood on it. One of the officers testified that Strong smelled strongly of alcohol.

Maurice and Deandre were taken to the hospital, both with multiple stab wounds. Deandre had surgery to repair his wounds and remained in the hospital for five days. Maurice died shortly after reaching the hospital. One of Maurice's wounds was described as an "evisceration" by a responding EMT, and the medical examiner testified that three of Maurice's wounds would have been fatal by themselves.

The jury also heard evidence that during an argument in 2010, Maurice "put a pistol in [Strong's] face" and pulled the trigger, but the gun jammed. In connection with that incident, Maurice was

arrested and spent seven months in jail, before being released.[6]

Additionally, witnesses described Maurice as "short-tempered," testifying that it did not take much "to set him off," and that he was "bipolar" and not taking medication for that condition. The jury also heard evidence that on the day of the stabbings, Maurice had been drinking alcohol; had a .072 blood-alcohol level;[7] and had threatened to throw a brick through the windshield of Strong's truck.[8]

At trial, Strong testified that the day before the stabbings, he and Felicie returned home from a weekend trip, and on the day of the stabbings, he visited a friend in the late afternoon where he had two shots of bourbon. When Strong returned home from his friend's house, Felicie was sitting in the kitchen looking angry. He asked her what was wrong, saying "[t]he kitchen is dirty again, so what's the

---

[6] Maurice pleaded guilty to aggravated assault and simple battery and was sentenced to five years in prison for aggravated assault and a concurrent twelve-month sentence for simple battery, to serve seven months based on credit for time served after his arrest.

[7] The medical examiner obtained the blood sample that was tested.

[8] At trial, Deandre acknowledged that when he was interviewed in the hospital after his surgery, he told the officer about Maurice's threatening to throw a brick, but he testified that he did not remember Maurice making that threat. Strong acknowledged that he never mentioned Maurice threatening to throw a brick but said "[he] couldn't remember every detail."

problem? Why are you sitting there, looking like you're looking?" Felicie did not answer him, and instead, she walked out of the house and drove away. After she left, Strong asked Maurice and Deandre why they had not cleaned up the kitchen, and an argument ensued. Strong chastised Maurice and Deandre for not cleaning up. He did not "go any further with the conversation" but went to his room. He "didn't feel easy about the conversation," "felt a little tension," and put his knife in his pocket and lay down on the bed, "napping out." Strong was almost asleep when his "door got kicked in."

Strong said he got up and went to the porch because he heard Maurice and Deandre laughing and talking. Maurice, Deandre, and Day were on the porch, and Strong walked up to Maurice and asked why Maurice kicked in his door. Deandre began to move towards Strong, and Strong asked him, "Where are you going? What are you doing?" At that point, Maurice took a "swing" at Strong and knocked his glasses off his face. Maurice had an object in his right hand, which Strong thought was "either a bottle or a bat." Strong used his left hand to grab Maurice's wrist to prevent Maurice from using the

9

object. Strong could not see well without his glasses and was not sure if the object Maurice was holding was a bottle or a bat. Deandre immediately jumped on Strong's back and started choking him. Strong "dipped [his] neck down real tight so [Deandre] didn't get the grip he wanted to get," and then Strong pulled the knife out of his right pocket. Strong's testimony continued:

> What happens next is when Deandre grabs me, that's when I pulled my knife. He pulls me back, and I hit [Maurice] like that (indicating). He pulls me back again, and I pulled the knife back with me and I pulled it away from him, and I hit [Maurice] again because now he has this object, trying to hit me with it, in his right hand. And I was hitting at his hand, trying to get him to drop it, while Deandre was steadily pulling me back. And I think I hit [Maurice] one more time. Deandre pulled me back again, and that's when I heard Maurice fall, but the object landed, I think, on the ground that he had in his hand to hit me with, the bottle he had in his hand to hit me with. And now I've got to kind of square myself off and try to get Deandre off my back because he was choking me really well. When I turned at the angle that I did turn, now I slipped down on the floor because Maurice had bled some and blood got under my sandals, and I slipped right on the floor. I think Deandre winds up on top of me.

> Strong explained that Deandre remained on top of him, hitting him, and that Strong told him to stop it because Strong wanted to get up and help Maurice. However, Deandre did not stop, saying,

10

"I've been wanting to do this," and kept swinging at Strong. Strong could have picked up the knife, which was by his leg, to stab Deandre, "but it wasn't any more, you know, damage to do to another person. He couldn't hurt me with his - - his only right hand." Day started yelling that the police were coming and jumped off the porch, and Deandre kept telling Day to "shoot, shoot, shoot." When police officers arrived, Strong told them that Maurice and Deandre attacked him and tried to kill him.

On cross-examination, the prosecutor asked Strong to use a replica knife to demonstrate how the stabbings occurred. Strong responded, "I'm not going to put that in my hand, ma'am." Defense counsel objected, saying, "Having the defendant wave a knife around in front of the jury, I don't …," and the trial court sustained the objection.

1. Strong contends that the trial court improperly excluded text messages sent to Maurice shortly before his death, arguing that the text messages show that the sender of the messages was concerned about how upset and angry Maurice was. At trial, the trial court

11

determined that the text messages were hearsay and so were inadmissible. Strong challenged that ruling in his motion for new trial. In denying that motion, the trial court rejected his claim—but on a different basis, concluding that the text messages were not relevant. On appeal, Strong contends that the text messages were not hearsay and that they were relevant. As explained below, we pretermit the resolution of these issues because we conclude that Strong has failed to show any harm stemming from the exclusion of the text messages.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. See *Mbungu v. State*, 322 Ga. 564, 567 (2025). "But we will reverse a conviction based on a trial court's abuse of discretion in excluding evidence only if the exclusion was harmful," and the test for nonconstitutional harmless error "is whether it is highly probable that the error did not contribute to the verdict." Id. at *608–09 (quotation marks omitted).

Strong attempted to introduce the text messages at issue during the cross examination of Detective Ronson Smith of the Cobb

County Police Department. On direct, Detective Smith testified that he performed a data extraction of Maurice's cell phone. The State offered into evidence, without objection, an exhibit showing part of the call log for Maurice's cell phone for the evening of August 24.[9] On cross-examination, Strong questioned Detective Smith about an entry on Maurice's call log that reflected that Maurice's phone received an incoming call at 11:07 p.m., lasting 46 seconds, from a contact named "Bighead Girl I Love."[10] Strong then attempted to introduce a different exhibit showing the content of text messages received by Maurice's cell phone from "Bighead Girl I Love" immediately after the 46-second phone call, but the State objected that the text messages were hearsay. The discussion about the exhibit then continued outside the presence of the jury.

According to defense counsel, the text messages to Maurice's

---

[9] Detective Smith testified that Maurice's cell phone call log showed an outgoing call on August 24 at 11:16 p.m. to Felicie. Felicie testified that after she left home on August 24, she received a brief phone call from Maurice, and based on that phone call, she did not expect him to be at home when she returned.

[10] As discussed in Division 4 below, Joanna Deutsch, who had been dating Maurice at the time of his death, testified at the motion for new trial hearing that she was the contact labeled "Bighead Girl I Love."

cell phone from "Bighead Girl I Love" said, "What are you talking about? Man, f\*\*k that s\*\*t. Ignore it. Let it f\*\*king go, and what the f\*\*k? Don't do s\*\*t. F\*\*k it. You have done so good."[11] The State reiterated its objection that the text messages were hearsay. Defense counsel countered that the messages were not being offered to show that Maurice "has, in fact done so good," but to show that "Maurice was upset," arguing:

> We're offering it to show that Maurice was upset, that when he had that 46-second phone call with Big Head Girl I Love, he communicated to her a feeling of frustration, and so when she responded to him, she sent these messages directly to him to calm him down or whatever have you because he communicated to her that he was upset. And so her -- the declarant's state of mind, Big Head Girl I Love, was that she was aware that Maurice was upset at the time that … they had a 46-second phone call.

The trial court excluded the exhibit as hearsay, which, subject to

---

[11] The exhibit is not included in the trial exhibits but was admitted into evidence during the motion for new trial hearing. The exhibit contains the following text messages from "Bighead Girl I Love," which were sent between 11:04 p.m. and 11:19 p.m.:
"What are u talking about"
"man f\*\*\* that s\*\*\* ignore it let it f\*\*\*\*\*\* go" [asterisks in original]
"What the f\*\*k. Don't do s\*\*t. F\*\*k it. You have done so good."

certain exceptions, is generally not admissible. See OCGA § 24-8-802. As noted above, in denying the motion for new trial, the trial court determined that the text messages were lacking in relevance because "their meaning was far too speculative."

On appeal, Strong contends that the text messages were not offered to establish the truth of the matter asserted but were offered to show the state of mind of the declarant who sent the texts—that the declarant "was upset that Maurice was upset and about to do something and he was angry and upset." Strong thus contends that the text messages were not hearsay under OCGA § 24-8-801(c), which defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Strong also contends that the messages were relevant to his claim of self-defense.

We need not decide whether the text messages were admissible as relevant, non-hearsay evidence because we conclude that, even if the trial court abused its discretion in excluding the text messages, Strong has failed to show harm. As detailed above, the jury heard

ample other evidence about Maurice's anger at Strong minutes before the stabbings, Maurice's volatile state of mind, and Maurice's past threats against Strong. And there was substantial evidence of Strong's guilt, including an eyewitness who testified that Strong stabbed Maurice without provocation and testimony about the sustained and vicious nature of the stabbings of both Maurice and Deandre. Additionally, Strong's self-serving testimony that he thought Maurice had a "bottle" or a "bat" was not supported by the eyewitness testimony, and the vague text messages would not have added substantial support to his self-defense claim. Accordingly, we conclude that it is highly probable that any error in the exclusion of the text messages did not contribute to the verdict. See *Mbungu*, 322 Ga. at 568 (concluding that exclusion of evidence of victim's threats against defendant was harmless where the excluded evidence was similar to other evidence that was admitted and where defendant's self-defense claim was weak); *Tarver v. State*, 319 Ga. 165, 171–73 (2024) (any error in exclusion of evidence about prior acts of the victim to show the defendant's state of mind when he shot the victim

16

was harmless given that the excluded evidence was largely cumulative of admitted evidence and the defendant's self-defense claim was weak); *Henderson v. State*, 310 Ga. 708, 713–14 (2021) (any error in excluding evidence of veiled threat the victim made to the defendant was harmless in the light of admitted testimony about more explicit threats the victim and an associate made to the defendant, and the strong evidence of the defendant's guilt). Accordingly, this claim provides no basis for reversing Strong's convictions.

2. Strong argues that the trial court abused its discretion in allowing the State to reference in closing arguments Strong's refusal to demonstrate how the stabbings occurred.[12] A closing argument must be judged in the context in which it is made, and it is well settled that a prosecutor is granted "wide latitude" in the conduct of

---

[12] Before closing arguments, the prosecutor said she wanted clarification from the trial court about whether she could mention in closing that Strong did not want to do the demonstration. Strong responded that such an argument would be improper, but the trial court said that the prosecutor could mention "in closing that he was given the opportunity to show how it was self-defense and he declined to do so."

her closing argument and may argue "reasonable inferences from the evidence, including any that address the credibility of the witnesses." *Johnson v. State*, 924 SE2d 451, 457 (Ga. 2025) (quotation marks omitted). We review the trial court's ruling on an objection to the closing argument for an abuse of discretion. See *Ridley v. State*, 315 Ga. 452, 456 (2025).

As set forth above, on cross-examination, Strong was asked if he would demonstrate how the stabbings occurred using a replica knife. Before his counsel could object, Strong said, "I'm not going to put that in my hand, ma'am." Strong's counsel objected, without providing a legal basis for the objection, and the trial court responded, "Sustained," without elaborating on the ruling. Strong's counsel did not move to strike Strong's response from the record or ask that the trial court instruct the jury to disregard it. During the State's closing argument, the prosecutor suggested that Strong refused to act out the scenario he described in his testimony because that scenario was false. Strong points to the following portion of the State's closing argument:

18

I gave him an opportunity. I said, Here, show us. Show us. Explain how you were so afraid; show us. You know, normally they say, Well, don't just let someone take it away from you on cross; right? And I left it wide open. Here. Here is a knife; show us what you did. Show us how you were so scared. I'm not putting that thing in my hand.

On appeal, Strong contends that this argument was improper because the State's prior request for Strong to demonstrate how the stabbing occurred was itself improper[13] and because the trial court sustained Strong's objection. However, as noted above, before Strong's defense counsel objected, Strong responded to the prosecutor's question by saying, "I'm not going to put that in my hand." And although defense counsel objected after Strong made this statement, his counsel did not also move to strike that testimony. Strong fails to cite any case, and we have found none,

[13] In support of his enumeration that the prosecutor's comments in closing argument were improper, Strong suggests that the prosecutor's request did not meet the requirements for admitting demonstrative evidence and cites *Smith v. State*, 299 Ga. 424, 434 (2016) (discussing provisions in current Evidence Code applicable to admissibility of "demonstrative" evidence, including "re-enactments"). An amicus brief filed by the Gwinnett County District Attorney's office collects research from federal and state courts addressing requests for similar demonstrations. Because the trial court sustained Strong's objection to the question, whether it was proper for the State to ask Strong to show how he acted in self-defense is not an issue before us in this appeal.

holding that a jury is not authorized to consider evidence presented before an objection is made and sustained, where the evidence has not been stricken from the record. Thus, although it does not appear that we have addressed this particular issue before, we conclude that Strong's answer to the prosecutor's question, which was not stricken and which the jury was not told to disregard, was evidence before the jury.[14]

Additionally, the State went on to argue that Strong's testimony about how the attack and stabbings unfolded was not true

---

[14] We note that federal courts and courts of our sister states have held, as a general matter, that where a witness answers a question despite the trial court sustaining an objection, the witness's response is evidence before the jury unless the trial court instructs the jury to disregard the evidence or orders it stricken from the record. See, e.g., Michael Graham, 2 Handbook of Fed. Evid. § 103:3 (10th ed.) (Nov. 2025 update) ("[E]ven though an objection to inadmissible evidence actually presented before the trier of fact is sustained, the evidence may nevertheless be considered by the trier of fact in the absence of a motion to strike.") (citing *United States v. Zaccaria*, 240 F.3d 75, 82 (1st Cir. 2001); *Rodriguez v. State*, 903 SW2d 405, 410 (Tex. App. 1995) ("Where an objection is made and sustained, but no motion is made to strike the answer or to instruct the jury not to consider, the testimony is before the jury for whatever it is worth."); *California v. Anguiano*, 2015 WL 1254632, *1, n.2 (Cal. App. 4 Dist. March 17, 2015). (unpublished) ("Thus, we apply the principle—frequently taught in trial advocacy classes, but rarely encountered in practice—that once testimony has been given, even if there is an objection, and even if the objection is sustained, the jury can still consider it unless, in addition, a motion to strike is made and granted.").

and that's why Strong did not want to demonstrate how the stabbings occurred, concluding this portion of the argument by saying that Strong had not "thought about how [he] would act it out. That's why he didn't put that knife in his hand. Common sense, ladies and gentlemen; credibility." Viewed in context, the prosecutor's comments were based on evidence the jury heard and were focused on challenging Strong's credibility. We therefore conclude that these comments were within the bounds of proper closing argument as they were based on permissible inferences and supported by facts in evidence. See *Johnson*, 924 SE2d at 456–57 (Ga. 2025) (rejecting claim that prosecutor's comments in closing argument were improper, where comments were based on permissible inferences and supported by the facts in evidence); *Pyne v. State*, 319 Ga. 776, 785 (2024) (explaining that a prosecutor's "wide latitude" in closing arguments includes being authorized to "discuss and draw inferences from factual matters relating to the credibility of witnesses") (quotation marks omitted). Accordingly, the trial court did not abuse its discretion in overruling the objection

21

and allowing the argument. See *Johnson*, 924 SE2d at 456–57. Thus, this claim fails.

3. Strong also contends that the trial court erred by refusing, over his objection, to charge the jury on mistake of fact given his testimony that he believed Maurice was holding a bat or a bottle. However,

> a mistake-of-fact instruction is not required, even upon request, if the 'mistake' or 'misapprehension' alleged by the defendant is the belief that the victim possessed a weapon or was about to use deadly force against the defendant, so long as the trial court fully instructs the jury on justification and self-defense, including analogous principles of justification and reasonable belief.

*Redding v. State*, 311 Ga. 757, 759 (2021). See also *Mbungu*, 322 Ga. at 569 (holding that there was no error in trial court's refusal to give mistake-of-fact instruction where the only mistake of fact claimed was the defendant's mistaken belief that the victim had a gun). Here, the trial court charged the jury fully on justification and self-defense, including charging that a defendant claiming self-defense must have a reasonable belief "that the use of such force is necessary to prevent death or serious bodily injury." Accordingly, Strong has

not shown error in the trial court's refusal to give an instruction on mistake of fact. Id.

Recognizing that *Redding* is fatal to his claim, Strong argues that *Redding* was wrongly decided because it improperly conflated separate affirmative defenses established by the General Assembly and set out in OCGA §§ 16-3-5 (mistake of fact) and 16-3-21 (justification). However, Strong does not engage in the type of stare decisis analysis that overruling *Redding*—and the cases dating back to at least 1965 on which it was based—would require, and we decline to do so. See *Profet v. State*, 322 Ga. 731, 738, n.3 (2025). Therefore, this claim lacks merit.

4. Finally, Strong asserts that his trial counsel was constitutionally ineffective in two respects. To prevail on his claim of ineffective assistance of counsel, Strong must prove deficient performance and resulting prejudice. See *Strickland v. Washington*, 466 US 668, 687 (1984). To establish deficient performance requires a showing that Strong's attorney's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in

23

the light of prevailing professional norms. See id. at 687–90. Decisions regarding trial tactics and strategy, including the decision about which witnesses to call, may form the basis for an ineffectiveness claim only if such decisions are so patently unreasonable that no competent attorney would have followed the same course. See *Davis v. State*, 315 Ga. 252, 262 (2022). To establish the required prejudice, Strong must show that, but for his attorney's unprofessional errors, there is a "reasonable probability" that the result of the proceeding would have been different. *Strickland*, 466 US at 694. "If either *Strickland* prong is not met, this Court need not examine the other prong." *Copney v. State*, 322 Ga. 794, 798 (2025) (quotation marks omitted).

(a) Strong contends that his trial counsel was deficient in failing to subpoena the author of the text messages to testify at trial. At the motion for new trial hearing, Joanna Deutsch, Maurice's girlfriend, testified that she was the contact labeled "Bighead Girl I Love"; that she had a brief phone call with Maurice shortly before his death; that, during that conversation, he said he

24

was having a verbal argument with Strong and was planning to leave the house; that he did not say he was planning any sort of violence against Strong; and that she sent the text messages after the phone conversation.

Trial counsel testified that he had called Deutsch, but once he identified himself as representing Strong, she hung up on him. Trial counsel also believed that Deutsch would have testified that the text messages meant something other than what counsel believed they showed and that it was risky to call her as a witness. The trial court credited trial counsel's testimony and determined that Strong failed to show that trial counsel's decision not to subpoena Deutsch was deficient.

Under these facts, Strong failed to establish that trial counsel's decision was objectively unreasonable. Here, the record reflects that trial counsel made a strategic decision not to call Deutsch, who was hostile and unlikely to provide testimony in support of the defense theory. Trial counsel's decision not to subpoena a hostile witness who would dispute the defense theory was not so patently

unreasonable that no competent attorney would have followed the same course. See *Carr v. State*, 301 Ga. 128, 129–30 (2017) (concluding that appellant failed to show that trial counsel was deficient for not calling a witness whose testimony would be "more harmful than helpful"). And moreover, Strong has not shown that but for the failure to subpoena Deutsch to testify, there is a reasonable probability that the result of the trial would have been different. As we concluded in Division 1, there was no harm from the exclusion of the text messages, and given Deutsch's testimony at the motion for new trial hearing that Maurice was not planning violence, we cannot say that any deficiency in failing to present her as a witness at trial was prejudicial. Thus, this claim fails.

(b) Strong also contends his trial counsel was ineffective in failing to object to the prosecutor's references to Strong's "prior testimony" in questions posed on cross-examination and in closing argument. However, Strong has not preserved this claim for appellate review. We have said that "[i]neffectiveness claims must be raised and pursued at the earliest practicable moment, which for

26

a claim of ineffectiveness of trial counsel is at the motion for new trial stage if the defendant is no longer represented by the attorney who represented him at trial," or the claim is forfeited on appeal. *Allen v. State*, 317 Ga. 1, 12–13 (2023) (quotation marks omitted). Strong did not raise this claim of ineffectiveness in his original or amended motions for new trial and did not raise it at the hearing on the motion. Although Strong questioned his trial counsel about this issue at the hearing, "questioning during the motion-for-new-trial hearing, by itself, is insufficient to amend a motion for new trial to add a claim where the trial court did not rule on the claim." Id. (quotation marks omitted). The trial court did not address this claim in its order denying the motion for new trial. Therefore, Strong has forfeited the claim.[15] See id. at 13.

For these reasons, Strong's claims of ineffective assistance of counsel fail.

---

[15] Strong asserted in his amended motion for new trial that he was denied a fair trial by the prosecutor's repeated mentions of his prior testimony. The trial court rejected this claim, noting that the prosecutor never mentioned that the prior testimony was elicited at a prior *trial*. Strong does not enumerate this ruling as error.

5. Strong also summarily asserts that "the cumulative effect of all errors must be considered," citing *State v. Lane*, 308 Ga. 10 (2020). At most there was one trial court error and one deficiency on the part of trial counsel, and even considering them collectively, we discern no combined prejudice warranting a new trial. As detailed above, the State's case included eyewitness testimony that Strong viciously attacked Maurice without provocation and attacked Deandre when Deandre tried to intervene. Additionally, Strong's claim of self-defense was not supported by the eyewitness testimony and was contradicted by his initial comment to Felicie, when he told her, "This is your fault." Moreover, even if the text messages had been admitted, either as non-hearsay or through Deutsch's testimony, they would have been merely cumulative of other evidence before the jury. Accordingly, Strong's claim of cumulative error fails. See *Asmelash v. State*, 323 Ga. 33, 44 (2025).

*Judgment affirmed. All the Justices concur.*